Whitaker, Judge,
delivered the opinion of the court:
Plaintiff’s petition alleges that it made a mistake in its bid for the construction of the Protective Equipment Laboratory at the Army Chemical Center at Edgewood, Maryland, and that this mistake was known to the contracting officer. Accordingly, it asks us to reform the contract so as to increase its bid of $20,000 on item 2 of the contract to $55,042.00, which it says is the amount it should have bid and would have bid except for the mistake.
Plaintiff is represented by one of the most respected members of the bar of this court. For many years he has served his clients honorably and well. He has made an able presentation of this case, but we regret to say that we are of opinion plaintiff is not entitled to recover. It is not entitled to recover unless the mistake was mutual. There is no doubt that plaintiff made a mistake, but there can be no recovery unless defendant was aware of the fact that it had done so. A contract, of course, will not be reformed for a unilateral mistake.
To show that defendant was aware that plaintiff had made a mistake in its bid, plaintiff relies primarily on the fact that the next lowest bid on item 2 of the contract was almost two and one-half times its bid. There was a great discrepancy between plaintiff’s bid on item 2 and the others. Plaintiff’s was $20,000; the others were $49,918, $60,531, $70,000, $95,000 *550 and $122,000. However, plaintiff’s bid was only $1,140 under what defendant bad estimated the work would cost.
So, the discrepancy between plaintiff’s bid and the others did not put defendant on notice that plaintiff had made a mistake, since its bid was so close to the defendant’s estimate of the cost.
The Invitation for Bids provided that the work wotdd “be awarded as a whole to one bidder.” Plaintiff’s total bid was only $38,002 lower than the next lowest bid, and only $49,334 lower than the next lowest. This is not a great variance on a one-half million-dollar job. The contracting officer’s attention was directed primarily to the overall bid; since on this basis plaintiff’s bid was in line with others, there was nothing here to make the contracting officer suspect that plaintiff had made a mistake.
As we have said, there is no doubt that plaintiff did make a mistake. It was a little careless in getting a bid on some work which plaintiff desired to do by subcontract. Before putting in its bid, plaintiff’s president, John J. Pécora, phoned the George H. Schuman Company, Inc., asking it to bid on a certain portion of the work, but the record is not clear as to just what part of the work was specified. At any rate, plaintiff thought the bid it received from Schuman over the phone covered the following items:
Section 25 (Plumbing and Piping) ;
Section 26 (Air Conditioning, Heating, Ventilating and Exhaust Systems);
Section 27 (Scrubber Tower and Tank); and
Section 34 (Steam Distribution System), except for steel supports and concrete required for the overhead steam lines.
Schuman did not think so. Plaintiff required of Schuman no written confirmation of its oral bid, as prudence would have required it to do. Schuman refused to do this work, and plaintiff had to get another subcontractor to do it, at a cost of $31,686.
After the bid opening, Pécora returned to his office and rechecked his bid calculations because he was concerned about the difference between his bid on item 2 and those of the other bidders. He found he had placed some items of *551 construction under bid item 1 that normally he would have placed under item 2, but he felt satisfied that there was no error in his overall bid. Since plaintiff was satisfied with its bid, after checking it, it can hardly be said that it was apparent to the defendant’s representatives that plaintiff had made an error.
Bids were opened on July 21, 1951; the award of the contract to plaintiff was made 27 days later, and 18 days later plaintiff was given notice to proceed with the work in ten days. Plaintiff acknowledged receipt of the notice to proceed on August 27, and the next day sent to Schuman for execution a subcontract which embodied the disputed items set out above. Schuman finally refused to execute the subcontract some time in September. Not until then did plaintiff suspect, so its president says, that there had been an error in its bid. Even so, plaintiff did not then mention the matter to defendant’s representatives because, it says, it did not know, even then, that it could not profitably do the work for the amount of its bid.
In January 1952 plaintiff got a bid on doing the work Schuman refused to do. Even then plaintiff did not mention the matter to defendant’s representatives, and did not do so until defendant issued a stop order on January 18,1952 stopping the work on these particular items.
After the stop order, plaintiff’s president, on January 24, 1952, had a conference with a representative of the District Engineer’s office relative to an adjustment on account of the stop order. At this time, plaintiff’s president sought to discuss the error in its bid, but defendant refused to consider this at the same time adjustments on account of the stop order were being considered. At this time plaintiff apparently did not inform defendant of the amount nor of the nature of the mistake it claimed to have made.
This was the first time plaintiff had mentioned the matter to defendant, and this was more than six months after the bids had been opened.
The work was completed on July 15, 1958. Not until November 13,1953 did plaintiff notify defendant of the cost it had incurred of rectifying the mistake it claimed to have *552 made. This was more than a year after the contract had been let.
It seems to ns apparent from the above recital that there was nothing to put defendant on notice, when it entered into the contract with plaintiff, that plaintiff had made a mistake. It is not contended that defendant had actual knowledge. This being true, there was no mutual mistake, and plaintiff is not entitled to reformation of the contract. Defendant’s liability is measured by the contract as drawn, subject to subsequent modifications.
Defendant also pleads the statute of limitations, but we do not discuss this defense because it seems so clear to us that plaintiff is not entitled to recover on the merits.
Plaintiff’s petition will be dismissed.
Davis, Judge; Duefbe, Judge; Laeaiioee, Judge; and Jokes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Bobert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a Maryland corporation. Its office and principal place of business is at Baltimore. It is wholly owned by two stockholders, John J. Pécora, its president (hereafter referred to as Pécora), who owns 75 percent of the stock, and Andrew Kingan, its vice president, who owns 25 percent.
2. On June 19,1951, the Baltimore District of the Corps of Engineers, United States Army, issued a public invitation for bids for construction of a Protective Equipment Laboratory at the Army Chemical Center, Edgewood, Maryland.
Bids were to be submitted on two items:
Item No. 1. Construction of the Protective Equipment Laboratory Building, complete, including utilities to a point 5 feet outside the building line.
Item No. 2. All work outside the Protective Equipment Laboratory Building line, including utilities not included in the Bid — Item No. 1.
*553 Tbe Invitation provided, however, that the work would “be awarded as a whole to one bidder.”
3. (a) Before bidding, Pécora, by telephone, requested a subcontract price for some of the work from the George H. Schuman Company, Inc. (hereafter referred to as Schu-man) , which had the plans and specifications of the proposed work. The record does not indicate in any detail what Pécora told Schuman in their preliminary telephone conversations about what part of the work he wanted Schuman to bid on.
(b) On the day the bids were due, Pécora, by telephone, requested and received Schuman’s bid of $132,000 for work Schuman proposed to do. Pécora was under the impression that Schuman’s bid for the subcontract work included all of the work and materials covered by the following sections of the Specifications:
Section 25 (Plumbing and Piping);
Section 26 (Air Conditioning, Heating, Ventilating and Exhaust Systems);
Section 27 (Scrubber Tower and Tank); and
Section34 (Steam Distribution System), except for steel supports and concrete required for the overhead steam lines.
(c) Pécora neither sought nor received written confirmation of Schuman’s oral bid, either before or after submitting plaintiff’s bid. Nor did Pécora, before submitting plaintiff’s bid, seek or receive bids on this work from any prospective subcontractor other than Schuman.
4. On July 10, 1951, six bids, including plaintiff’s, were submitted. Table 1 below shows the total amount of each of the six bids, together with the amount of each bidder’s bid on items 1 and 2, as well as the Government’s estimate.
Table 1
Bidders Bid item No. 1 Bid item No. 2 Total bid
Government’s estimate_ $386,602 $21,140 $407,742
Allied Contractors, Inc_ 434,711 20,000 454,711
Charles R. Scrivener Co., Inc_ 432,182 60,531 492,713
Hadley Construction & Contracting Co_ 454,127 49,918 504,045
Piracci Construction Co., Inc_ 420,000 95,000 515,000
É. C. Machin, Inc___ 407,000 122,000 529,000
I. H. Williams & Co_ 474,000 70,000 544,000
*554 5. Plaintiff was tbe low bidder by $38,002 overall. Plaintiff’s total bid was $89,289 less than the highest total bid. Its bid on item 2, also the lowest received on that item, was $39,918 under the next lowest bid on item 2 (Hadley— $49,918) and $102,000 under the highest bid on item 2 (Machin — $122,000). Its bid on item 1, however, was higher by $27,711, $14,711, and $2,529, than the three lowest bids on item 1.
6. Pécora was present at the bid opening, as were other bidders. Neither Pécora nor any other bidder, nor any Government representative at the bid opening, commented on the differences in the bids submitted.
7. After the bid opening, Pécora returned to his office and rechecked his bid calculations because he was concerned about the difference between his bid on item 2 and those of the other bidders. He found he had placed some items of construction under bid item 1 that normally he would have placed under item 2, but he felt satisfied that there was no error in his overall bid. It is a reasonable inference from Pecora’s satisfaction with plaintiff’s bid at that time that no error in its bid was then apparent to the Government’s representatives.
8. On August 6,1951, 27 days after the bid opening, plaintiff was notified that its bid was accepted and the formal contract was executed on that same date.
9. On August 24,1951, the contracting officer notified plaintiff to proceed with construction and, on August 27, 1951, plaintiff acknowledged recei pt of that notice. The contract required plaintiff to commence work within 10 calendar days after receipt of the notice to proceed. As of that date, plaintiff had no knowledge of any mistake in its bid and apprised the Government of none.
10. Upon receipt of the signed contract, plaintiff sent to Schuman a proposed subcontract, prepared for execution August 28, 1951, which covered items 25, 26, 27, and 34 of the contract specifications “Except for the steel supports; and concrete required for overhead steam line * * and specified a price for that work of $132,000. This proposed subcontract represented Pecora’s understanding of Schu- *555 man’s proposal received by telephone on the bid opening date.
11. Early in September 1951, Schuman telephoned the plaintiff, requesting clarification as to the extent of the exception that was written into the subcontract of August 28,1951. Schuman objected that the exception did not read properly. He claimed it should exclude from the work Schuman was to do, not only the steel supports for the steam line but all steel items in connection with the scrubber tower, the caustic tank, and their contents. He said Schuman would be willing to sign a subcontract similar to the proposed subcontract of August 28, 1951, to do the work for $132,000 if the exception, stated in the proposed subcontract, were modified to include within the exception the following items:
A. Steel supports for steam line.
B. Steel scrubber tower and contents (contents meaning the Iiaschig Bings).
C. Scrubber ducts.
D. Steel caustic tank.
Schuman refused to execute the proposed subcontract of August 28,1951, unless it was so modified, and returned the document, unsigned, to plaintiff by messenger.
12. Much discussion failed to persuade Schuman to meet the terms of the proposed subcontract Pécora first submitted to him.
13. According to Pécora, the plaintiff did not suspect that there might be an error in the amount of its bid until it became evident, during September, that Schuman would not sign or perform the proposed subcontract plaintiff first submitted.
14. Despite these suspicions in September 1951, however, plaintiff did not then notify the defendant’s representatives (who knew nothing about plaintiff’s negotiations with Schu-man) of any claim of error, for the reason, according to Pécora, that plaintiff did not know, even then, whether the cost of getting the materials and work Schuman had refused to furnish would exceed the cost estimates, based on Pecora’s interpretation of Schuman’s oral bid, upon which Pécora had relied in computing plaintiff’s bid.
*556 15. Plaintiff renegotiated all of the items covered in the proposed subcontract which Schuman had refused to sign. According to Pecora’s testimony, it was not until January 1952, that plaintiff definitely determined the costs of these items. It then found that the cost of items 25, 26, 27, and 84 would total $163,236. Of this total, the cost of items Pécora thought were included in Schuman’s original oral bid, but which Schuman insisted were not included, was $31,686. These items were scrubber towers and labor to install them, caustic tank, Kascbig Kings, scrubber ducts, and painting.[1] To the price of these omitted items, plaintiff added production and office overhead, less profit, in the amount of $3,010, and a bond at 1 percent, in the amount of $346, to arrive at the total of $35,042 it now claims as the mistake in its bid.
16. In arranging for the work under the contract, plaintiff entered a subcontract with Schuman, dated October 9,1951, to perform some of the work required by the contract. The work to be done by Schuman under this subcontract is different from, and less than, that contemplated by the pro *557 posed subcontract originally submitted to Schuman, and rejected. Omitted from Schuman’s ultimate undertaking were not only Section 27 (scrubber towers and tank) but also Section 26 (air conditioning, etc.), both of which Pécora claims he thought were included in Schuman’s original, oral bid. The amount ($80,880) to be paid Schuman for the work Schuman finally undertook to do is $51,120 less than the $132,000 provided in the proposed subcontract that was rejected. The difference of $51,120 has no apparent direct relation, however, to the measure of the error plaintiff claims in its bid. As indicated in finding 15, the amount plaintiff attributes to the error is $31,686, the additional amount plaintiff claims it had to pay to get the Section 27 work done elsewhere, plus overhead and the cost of a bond.[2]
17. Plaintiff arranged for others to furnish the work and materials Schuman refused to furnish, and the work proceeded.
18. Even in January 1952, after the plaintiff had determined the costs of having others do the work Schuman refused to do, plaintiff did not notify defendant’s representatives of its claim of error except by mentioning the fact that an error was claimed in the course of oral discussions, hereafter described, of adjustments necessitated by a change in the construction plans which led to a suspension and ultimate deletion of some of the work under the contract.
19. On January 18, 1952, the defendant issued a Stop Order directing the plaintiff to suspend all work on the scrubber towers, the caustic makeup tank, and piping incidental thereto. These were the items which, according to plaintiff, Schuman had refused to furnish.
20. Before the Stop Order was issued, considerable work had been done on the items it affected. Defendant thereafter ordered plaintiff to deliver the materials covered by the Stop *558 Order but not to install them, and plaintiff did as it was directed.[3]
21. On January 24, 1952, Pécora had a conference with a representative of the District Engineer’s office, named Har-grove. At that conference, he sought to discuss the plaintiff’s claim of an error in the bid. Hargrove apparently refused to consider adjustments based on the claim of error in the bid along with questions arising out of the change in the construction program. It seems apparent from the record that such effort as Pécora made to present the question of error in the bid received scant consideration, and that the most he succeeded in communicating to Hargrove was the fact that plaintiff claimed an error had occurred, and wanted the error considered along with the adjustments growing out of the suspension. It is reasonably clear from the record that he did not at that time state to defendant’s representative the amount or composition of the error claimed.
22. Plaintiff claimed that it incurred delay costs amounting to $5,691.01 as a result of the Stop Order. On February 21,1952, plaintiff asserted this claim in a letter to the Resident Engineer at the Army Medical Center at Edgewood, Maryland, who responded, on February 26, 1952, stating that approval of the claim for delay could not be recommended. Plaintiff made no mention of its claim of error in the bid in its February 21 letter submitting this claim for delay costs. In its petition plaintiff makes no claim for compensation by way of damages or otherwise on account of the issuance of the stop order, and in its oral argument plaintiff’s counsel stated that plaintiff was not then making any claim on this account.
23. Thereafter, until December 17, 1953, there were telephone conversations from time to time, and some written *559 communications, between plaintiff and defendant’s representatives in an effort to settle upon an agreeable basis for adjusting the amount to be paid under the contract. Plaintiff appears to have contended that these adjustments should include an adjustment for the error it claimed had occurred in its bid, although the record does not show that plaintiff made any specific representations to the defendant about the amount of the error it claimed before November 13, 1953, when it submitted a schedule of costs it claimed to be attributable to Schuman’s refusal to furnish the work and materials Pécora thought Schuman had proposed to furnish. Pécora testified that the plaintiff had furnished the defendant, in April 1952, with purchase orders and schedules which he said “in effect” gave the defendant the same information about the cost of the omitted items as was conveyed by the November 13, 1953, schedule. Whatever may have been furnished in April does not appear in the record, however, and it seems reasonably clear that plaintiff submitted no detailed, specific, written statement of the amount of damage it attributed to error in the bid until November 13, 1953.
24. Meanwhile, by July 15, 1953, the work under the contract, including all modifications, was completed.
25. On November 13,1952, the defendant submitted to the plaintiff Change Order No. 9, covering work and materials eliminated from the plaintiff’s contract following the Stop Order first referred to in finding 19. In computing the amount of the credit accorded by Change Order No. 9 no recognition was given to plaintiff’s claim of error in its bid. The plaintiff objected to it for that reason. Additional conferences and telephone conversations ensued. These failed to lead to any agreement, and the plaintiff refused to execute the change order.
26. On December 1Y, 1953, the Contracting Officer stated in a letter to the plaintiff that plaintiff’s contention that an error was made in its bid could not be considered in connection with the change order but must be considered separately, and rejected plaintiff’s position that correction of the alleged error must be a condition precedent to the recovery of a credit by the Government for the work deleted. He further deter *560 mined that the credit provided in Change Order No. 9 was fair and reasonable and constituted the equitable adjustment of the contract price required under article 3 of the contract relating to changes and extras, and concluded that Change Order No. 9 represented a full and final adjustment of the contract price for the work done.
27. Article 6 of the contract provided as follows:
Disputes: Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and send by registered mail, return receipt requested, a copy thereof to the contractor at his address shown herein. Within 30 days from the receipt thereof, the contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless, within 30 days after receipt thereof by the contractor, he appeals in writing to the Secretary of the Army, which appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary of the Army, his written decision, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto. The Chief of Engineers or the Secretary of the Army may designate an individual or individuals, other than the Contracting Officer, or a board, as his authorized representative to determine appeals under this article. In any proceeding under the provisions of this article, the contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. Pending decision of a dispute hereunder the contractor shall diligently proceed with the performance of this contract. Any sum or sums allowed to the contractor under the provisions of this article shall be paid by the Government as part of the cost of the work herein contracted for and shall be deemed to be within the contemplation of this contract.
28. On January 15, 1954, plaintiff filed an appeal with the Chief of Engineers. After a hearing, the Claims and Appeals Board of the Corps of Engineers, on October 7, 1958, *561 beld that it bad no authority to reform, the contract because of any mistake in bid.
29. Thereafter, the plaintiff appealed its case to the Armed Services Board of Contract Appeals and that Board, on December 14, 1959, refused to consider the plaintiff’s claim for reformation of the contract because of the error in the bid and affirmed the decision of the Chief of Engineers.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and its petition is dismissed.

 The defendant offered a memorandum written August 18, 1951, by Jones, a representative of the defendant, summarizing the discussion at a conference held August 15, 1951, to preview the plaintiff’s plans for performance of the contract. The memorandum was offered to show that, as late as August 15, 1951, plaintiff did not intend to subcontract the work and materials which it now claims it was relying upon Schuman to furnish; that accordingly there could have been no previous reliance, in July, on Schuman’s oral bid; that the Schuman mixup was, therefore, either a fiction or an afterthought; and that there really had been no error in the bid when it was made.
In the midst of a general summary of what appears from the text of the memorandum to hiave been a rather detailed discussion of some aspects of the contractor’s program, the memorandum states: “On this job the prime contractor proposes to perform the following work; — excavation, concrete work, steel erection, masonry, outside utilities and erection of outside stacks and towers. Contractor proposes to subcontract as follows — outside electrical work, inside electrical work, roofing, plumbing, heating and ventilation, piping and plastering. * * *”
Although the Jones memorandum casts a shadow of doubt, it is not persuasive that the difficulties Pécora testified he had with Schuman did not occur as he said they did. The conference appears to have been merely a preliminary discussion of the contractor’s plans for performing the contract. It involved no immutable commitments or representations. Its list of the various items to be subcontracted or performed by the prime contractor is not an exhaustive list of all items requiring performance one way or the other. A memorandum such as this, made several days afterwards from notes of a generalized discussion, is susceptible to various opportunities to reflect error in statement, understanding, or recollection, as well as tentative changes in plans subsequent to the bidding that might well be subsequently reversed.

 In a construction schedule submitted December 15, 1951, plaintiff estimated the cost of the Section 26 wort at $54,000, an amount which alone is greater than the difference between the $80,880 at which Schuman undertook the work, excluding the Section 26 and Section 27 items and the $132,000 price at which Pécora said he understood Schuman proposed to do the work, including both the Section 26 and Section 27 items.

 In view of the fact that apparently none of this material was installed, it is difficult to understand- how the plaintiff might properly have included labor to install the scrubber towers as an element of the damage it claimed resulted from the error in its bid. In its schedule A, submitted November 13, 1953, of items erroneously not included as part of Bid Item II, plaintiff shows “scrubber towers” — ¡material—*$23,500—labor—$615—total $24,115. Pécora testified at p. 29 — i“Xes. We purchased scrubber towers, with the labor to install them. It was $24,115..,,