## TIMBER INVESTORS, INC.

v.

## The UNITED STATES.

No. 61–75.

United States Court of Claims.

Nov. 15, 1978.

---

Lyman C. Johnson, Bend, Or., attorney of record, for plaintiff.

Jean Schepers, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed June 2, 1978, requesting that the court adopt the recommended decision of Trial Judge Thomas J. Lydon, filed April 24, 1978, pursuant to Rule 134(h), as the basis for its judgment in this case since neither party has filed a notice of intention to except thereto and the time for so filing pursuant to the Rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby grants defendant's motion of June 2, 1978, and affirms and adopts the decision as the basis for its judgment in this case. Accordingly, it is concluded as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed April 24, 1978, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

## OPINION OF TRIAL JUDGE

LYDON, Trial Judge. On March 31, 1970, plaintiff, as the highest bidder, was awarded a timber sale (identified as the Varmint Creek Timber Sale (VCTS)) contract by the Forest Service, United States Department of Agriculture, whereby, for the payment to the Forest Service of $466,-722, it was permitted to cut and remove 24.5 million board feet of Forest Service timber from 3,500 acres of the Ochoco National Forest in Oregon. As an adjunct to this timber sale contract, plaintiff was required to construct two new roads and to perform reconstruction work on five existing roads in this National Forest for the payment to it by the Forest Service of $351,865. The road construction work, involving some 25.9 miles, was primarily to facilitate the removal of Forest Service timber, although some of the roads would also have recreational use. The Forest Service estimated that it would cost $351,865 to perform the road construction work called for by the contract. The cost (referred to as purchaser road credit) of the work required for each of the seven roads was estimated separately in the contract to arrive at the total estimated cost figure of $351,865 (purchaser road credit limit). The total estimated cost figure represented the maximum purchaser road credits available under the contract for the road construction work called for by the contract plans and specifications.[1] It is the road construction work phase of the contract that precipitated this litigation.

Plaintiff was a frequent purchaser of Forest Service timber and was most familiar with timber sale procedures, purchaser road credits, etc. However, plaintiff was in the timber business, and did not engage in road construction work. Accordingly, when it was awarded a timber sale contract that involved road construction work, plaintiff would engage a road contractor to perform such work. The Forest Service was aware that some timber companies, such as plaintiff, relied on subcontractors to perform the road construction work called for by timber sale contracts. Plaintiff would make every effort to induce a road contractor to perform contract road construction work for the purchaser road credit limit set forth in the contract. Sometimes it was successful in this effort; at other times it had to pay road contractors amounts in excess of said contract figure in order to induce them to perform the road construction work called for by timber sale contracts awarded it by the Forest Service.

On June 23, 1970, plaintiff entered into a contract with Reid Brothers, Inc. (Reid) wherein Reid agreed to perform the road construction work called for by plaintiff's timber sale contract with the Forest Service for $350,339. Edwin W. Reid, Jr. (E. W. Reid) was president of the company and the motivating force behind all company activities. It is to be noted that Reid agreed to do the work for $1,526 less than the Forest Service estimated cost of doing the work as reflected in the contract's purchaser road credit limit of $351,865.

Plaintiff brings the present suit on behalf of its subcontractor, Reid, seeking to recover $70,483 representing excess costs over and above the contract purchaser road credit limit which Reid claims it incurred in performing the road construction work called for by plaintiff's timber sale contract. Plaintiff and Reid blame the Forest Service for these excess costs.

I

Plaintiff seeks reformation of its timber sale contract with the Forest Service on two alternative grounds. First, plaintiff main-

---

1. Purchaser road credit was a unique feature of Forest Service timber sale contracts. It was the result of joint efforts by the Forest Service and the timber industry to permit a successful timber purchaser to receive more expeditious credit for performing road construction work in connection with timber purchases by allowing the timber purchaser to receive credit in the Timber Sale Account it maintained with the Forest Service, computed in accordance with contract provisions and limited by the total estimated cost of road construction work set forth in the contract, toward the purchase price it had to pay the Forest Service for the right to cut and remove Forest Service timber.

tains that all concerned parties were mutually mistaken as to the unreasonable inaccuracy of the Forest Service estimates of work and related costs, which were set forth in the contract and which were part and parcel of the contract purchaser road credit figures. The record supports a finding that all the parties believed prior to bidding on the timber sale contract that the Forest service work and cost estimates were reasonably accurate. Implicit in plaintiff's contention, as it must be for mutual mistake to justify a reformation request, is the belief that the Forest Service intended that reasonably accurate estimates underscore its purchaser road credit contract figures. *See Ling-Temco-Vought, Inc. v. United States*, 475 F.2d 630, 639, 201 Ct.Cl. 135, 150 (1973). Case law would lend support to recovery on this ground if, in fact, the contract estimates were as unreasonably inaccurate as plaintiff suggests. *See Peter Kiewit Sons' Co. v. United States*, 74 F.Supp. 165, 167–68, 109 Ct.Cl. 517, 522 (1947); *Virginia Engineering Co. v. United States*, 101 Ct.Cl. 516, 532 (1944). However, plaintiff must show a mistake by the Forest Service in the contract estimates before it can obtain reformation. Otherwise the mistake is not mutual. *Fraass Surgical Mfg. Co. v. United States*, 571 F.2d 34, 38, 215 Ct.Cl. 820, 826 (1978). There is no allegation nor evidence of bad faith on the part of the Forest Service in drawing up the contract work and cost estimates. *See C. W. Roberts Constr. Co. v. United States*, 204

Ct.Cl. 913, 914 (1974); *see also Pacific Architects & Eng. Inc. v. United States*, 491 F.2d 734, 742, 203 Ct.Cl. 499, 514 (1974).

Second, and alternatively, plaintiff argues that the Forest Service misled prospective bidders by misrepresenting in the contract documents that "reasonably intensive investigations" were made of surface and subsurface conditions. Plaintiff's position appears to be that had the Forest Service conducted reasonably intensive surface and subsurface investigations the contract estimates of work and related costs would have been more reasonably accurate. To justify reformation of a contract on the ground of misrepresentation, the evidence must be clear and convincing. A party seeking reformation on the ground of misrepresentation must show not only that the misrepresentation was false, but that it was actually misled by it. *Tree Preservation Co. v. United States*, 172 Ct.Cl. 577, 581 (1965).[2] On this record, the evidence of misrepresentation on which plaintiff relies in support of reformation is far from clear and convincing.[3]

Defendant seems to argue that under the purchaser road credit provision of the contract plaintiff agreed to perform the road construction work called for by the contract plans and specifications for $351,865 and thus cannot recover any amount in excess of that figure on the theory of mutual mistake, or on any other legal theory.[4]

---

**2.** The misrepresentation must be relied upon and must induce a party to do something to his detriment which he would not otherwise have done. *Associated Traders, Inc. v. United States*, 169 F.Supp. 502, 144 Ct.Cl. 744, 750 (1959). The record indicates rather clearly that plaintiff did not rely on the contract language relating to reasonably intensive surface and subsurface investigations. Indeed, the evidence indicates plaintiff was indifferent as to whether the contract estimates were reasonably accurate or not and would have entered into the contract in any event. *See Rough Diamond Co. v. United States*, 351 F.2d 636, 643, 173 Ct.Cl. 15, 27–29 (1965). Edwin W. Reid, Jr. (E. W. Reid), president of Reid, testified he relied on the contract estimates but there is no reliable evidence he relied on the contract language which now forms the basis for plaintiff's misrepresentation claim.

**3.** The findings of fact accompanying this opinion (finding Nos. 14–25) detail the surface and subsurface investigations conducted by the Forest Service relative to preparation of the contract road construction work plans, specifications, estimates and costs. Plaintiff has failed to persuade that these surface and subsurface investigations were not reasonably intensive under the circumstances.

**4.** Defendant stresses that the contract stated clearly that the purchaser road credit limit was the maximum amount available for road construction work. Defendant further emphasizes that the provisions of the contract and related documents available to bidders clearly indicated that the estimates were just that and were not to be considered as guarantees of any kind. On the basis of these contract provisions alone, defendant contends, plaintiff cannot re-

Defendant, in advancing this position, gives no consideration to the contention of plaintiff that the estimates which underscored the $351,865 figure were grossly inaccurate. *Evans Reamer & Machine Co. v. United States*, 386 F.2d 873, 880, 181 Ct.Cl. 539, 551 (1967), relied on by defendant, does not support defendant's broad and rather cavalier disavowal of liability. The *Evans* case did not involve the question of whether grossly erroneous estimates would support contract reformation on the ground of mutual mistake. As indicated earlier, grossly erroneous estimates can, under certain circumstances, support a reformation claim grounded on mutual mistake. Moreover, there is no evidence that either plaintiff, its subcontractor, or the Forest Service, believed, or had reason to believe, prior to contract award, that any mistake had been made relative to the work and cost estimates set forth in the contract. *Compare Perini Corp. v. United States*, 381 F.2d 403, 415, 180 Ct.Cl. 768, 788 (1967). (Contractor recognized that government contract estimate was grossly inaccurate and thus did not rely on it.) In this case, all the parties operated on the assumption the estimates were reasonably correct. It would be only by contract performance in most instances that one would be able to uncover estimating mistakes. Accordingly, *Allied Contractors, Inc. v. United States*, 310 F.2d 945, 159 Ct.Cl. 548 (1962), relied on by defendant, has no relevancy to the factual situation present in this case. In the *Allied* case, a

contractor's mistake in bid which was not sufficiently apparent to put government officials on notice of it at time of award and which was not called to the attention of the government until some months after the contract work had commenced was deemed a unilateral mistake and thus provided no basis for contract reformation.

Defendant also implies that plaintiff as the prime contractor with the Forest Service, who makes no claim on its own behalf, cannot recover on behalf of its subcontractor who asserts claims arising out of the prime contract but had no contractual relationship with the Forest Service. Plaintiff, while denying any liability on its part to Reid, believes it has a moral obligation to assist its subcontractor in recovering on what it believes are just claims and will undoubtedly reimburse its subcontractor, Reid, for the damages it has suffered at the hands of the Forest Service, but only as and when plaintiff receives payment for said damages from the government. Under these circumstances, such a suit by a prime contractor on behalf of its subcontractor is permissible. *J. L. Simmons Co. v. United States*, 304 F.2d 886, 158 Ct.Cl. 393 (1962); cf. *Putnam Mills Corp. v. United States*, 479 F.2d 1334, 202 Ct.Cl. 1 (1973) (which did not involve a suit by a prime contractor on behalf of its subcontractor).[5]

The factual question to which the parties direct their legal liability arguments is whether the Forest Service estimates of road construction work and costs were rea-

---

cover. However, these provisions, standing alone would not insulate the government from liability if the contract estimates were so grossly erroneous as to indicate a failure to exercise reasonable care and diligence in arriving at said estimates. *See Womack v. United States*, 389 F.2d 793, 801, 182 Ct.Cl. 399, 413–14 (1968); *see also Schutt Constr. Co. v. United States*, 353 F.2d 1018, 1021, 173 Ct.Cl. 836, 842 (1965). This broad nonliability position of defendant is plainly unacceptable.

5. The timber sale contract contained a "Disputes" clause. Further, the contract did contain certain provisions whereby the purchaser road credit limit could be exceeded (*see* finding Nos. 10(c) and 27(c)). However, there seems to be agreement, albeit *sub silentio*, that the claims advanced herein are outside the pale of

any contract adjustment provision. In its answer, defendant pleaded, as an affirmative defense, that plaintiff's claim was barred because it failed to exhaust its administrative remedies. Defendant has not mentioned this defense in its proposed findings of fact nor in its brief to the trial judge. Accordingly, defendant is considered to have abandoned this defense. *Nossen v. United States*, 416 F.2d 1362, 1371, 189 Ct.Cl. 1, 18 (1969). *See also Singer Co. v. United States*, 568 F.2d 695, 717–18, 215 Ct.Cl. 281, 321 (1977). Moreover, the reformation claim advanced by plaintiff is considered to be beyond the jurisdiction of the administrative board. *Edward Hines Lumber Co.*, AGBCA No. 72–125, 76–1 BCA ¶ 11,854. *See Burnett Electronics Lab. v. United States*, 479 F.2d 1329, 1330, 202 Ct.Cl. 463, 466 (1973).

sonably accurate. Plaintiff maintains these estimates were grossly inaccurate; defendant contends they were reasonably accurate. As to estimates generally, the following observations of this court in *Womack v. United States*, 389 F.2d 793, 801, 182 Ct.Cl. 399, 412–13 (1968) are most appropriate:

> An estimate as to a material matter in a bidding invitation is an expedient. Ordinarily it is only used where there is a recognized need for guidance to bidders on a particular point but specific information is not reasonably available. *H. L. Yoh Co. v. United States*, 288 F.2d 493, 494, 153 Ct.Cl. 104, 105 (1961). Intrinsically, the estimate that is made in such circumstances must be the product of such relevant underlying information as is available to the author of the invitation. If the bidder were not entitled to so regard it, its inclusion in the invitation would be surplusage at best or deception at worst. Assuming that the bidder acts reasonably,[3] he is entitled to rely on

> [3] *Russell & Pugh Lumber Co. v. United States*, 154 Ct.Cl. 122, 127, 290 F.2d 938, 941 (1961).

> Government estimates as representing honest and informed conclusions. *Snyder-Lynch Motors, Inc. v. United States*, 292 F.2d 907, 909–10, 154 Ct.Cl. 476, 479 (1961). In short, in promulgating an estimate for bidding-invitation purposes, the Government is not required to be clairvoyant but it is obliged to base that estimate on all relevant information that is reasonably available to it.

■ Under the circumstances of this case, Reid was entitled to, and did, rely on the bulk of the estimates in question. *See*

*Fehlhaber Corp. v. United States*, 151 F.Supp. 817, 825, 138 Ct.Cl. 571, 584, *cert. denied*, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957).[6] Unlike the situation in *McNamara Constr. Ltd. v. United States*, 509 F.2d 1166, 206 Ct.Cl. 1 (1975) where the government was not responsible for the labor problems which increased the contractor's costs and which served as the basis for the rejected reformation claim presented therein, the instant case presents a situation where the Forest Service prepared work and cost estimates, ostensibly to induce road contractors to perform said work, which are challenged by plaintiff as being grossly inaccurate and which were relied on by its subcontractor to the subcontractor's detriment.

In analyzing the question of legal liability in this case, it seems reasonable to approach the matter by viewing the Forest Service estimates of work and costs, which made up the total purchaser credit limit set forth in the contract, as representations that said estimates were reasonably accurate relative to the road construction work called for by the contract. Neither plaintiff nor its subcontractor can be deemed required by any language in the contract to presume the possible unreasonable inaccuracy of these Forest Service estimates. *See Virginia Engineering Co. v. United States, supra*, 101 Ct.Cl. at 530. Further, under the circumstances of timber sale contracts, it would not seem reasonable to require plaintiff, or its subcontractor, to conduct their own engineering investigations in order to ascertain the accuracy or inaccuracy of the Forest Service estimates.[7] Accordingly,

**6.** Defendant also suggests that plaintiff's claim should be denied because neither plaintiff nor Reid examined all the pertinent material that would have been available to them had they asked the Forest Service for it prior to bidding. Defendant, however, does not explain how examination of such materials would have aided plaintiff and Reid in reaching conclusions as to the accuracy and reliability of the estimates in question. There is nothing in the record which suggests that examination of these materials would have revealed gross inaccuracies in the estimates. Indeed, the government in defending the reasonable accuracy of the estimates at

this time impliedly concedes that examination of all materials and personal inspection of all road areas before bidding would have justified acceptance of the estimates as accurate and reliable. As a result, defendant's reliance on *Flippin Materials Co. v. United States*, 312 F.2d 408, 160 Ct.Cl. 357 (1967) is misplaced.

**7.** The evidence indicates that the Forest Service was aware that purchasers of Forest Service timber and/or road contractors relied on these estimates and never attempted to reengineer and recost the road construction work in an effort to evaluate the accuracy of the Forest Service work and cost estimates before bidding

plaintiff and its subcontractor had a right to rely, as indicated previously, on the reasonable accuracy of the Forest Service work and cost estimates. If these estimates are shown to be unreasonably inaccurate, then defendant breached the contract and plaintiff would be entitled to recover, on behalf of its subcontractor, resulting damages. *See Morrison-Knudsen Co. v. United States,* 345 F.2d 535, 539, 170 Ct.Cl. 712, 718–19 (1965); *see also Peter Kiewit Sons' Co. v. United States, supra,* 74 F.Supp. at 167–68, 109 Ct.Cl. at 522. This does not mean, however, that plaintiff and its subcontractor can shut their eyes with reference to a particular cost estimate which could easily be verified by merely contacting a local supplier. A bidder must act reasonably in relying on estimates.

The above approach seems appropriate under the circumstances of this case. The use of a purchaser road credit limitation on road construction work is unique and seems to be confined to Forest Service timber sale contracts.[8] Generally, the government solicits bids from contractors on construction work called for by contract. In such instances, contractors have some say in the matter by way of their bids. If their bids are improvidently low, the contractors must bear the loss occasioned thereby. *See Pacific Architects & Eng. Inc. v. United States, supra,* 491 F.2d at 739, 203 Ct.Cl. at 506, 508. However, under the purchaser

road credit provision the Forest Service estimates the cost of the road construction work to be performed. Contractors have no say in the matter. Successful purchasers of Forest Service timber must perform the road construction work called for by the timber sale contract at the estimated cost price set forth by the Forest Service. Under these circumstances, the contract representation that reasonably intensive surface and subsurface investigations had been conducted by the Forest Service would lead reasonable and prudent bidders to view the products of such investigations, *i. e.,* the contract work and cost estimates, as reliable and reasonably accurate. It would also serve to justify reliance by a timber purchaser and/or road contractor on such estimates as being reasonably accurate.

## II

Reid, involved in road construction work since 1957, had a great deal of experience in road surfacing work, but its experience in road excavation and clearing work was not very extensive as of 1970. Reid was interested in performing the VCTS contract because it entailed a lot of road surfacing work. Dollar-wise, the VCTS road surfacing work consumed almost 60 percent of the original contract purchaser road credit limit of $351,865.[9]

on the timber sale. Under such circumstances, the Forest Service was under some obligation to ensure that their estimates were reasonably accurate.

8. Another unusual feature of the contract purchaser road credit figures is that they are devoid of any factor for profit and risk. Initially, the Forest Service computed the cost of performing the road construction work and included therein a cost factor for profit and risk. However, in the bid solicitation, the profit and risk *cost factor was removed from the purchas*er road credit figure and incorporated, in some fashion, in the establishment of the minimum bid rate timber stumpage figure set forth in the solicitation. As a result, the contract purchaser road credit figure of $351,865, which was the Forest Service estimate of the cost of the road construction work, did not contain any factor for profit and risk. Accordingly, the timber purchaser, plaintiff herein, received the benefit of this profit and risk factor in purchasing the

timber, but Reid, the road contractor, received no such benefit in the purchaser road credit limitation figure set out in the contract. This is why timber purchasers such as plaintiff made every effort to induce road contractors to perform the road construction work for the contract purchaser road credit figure. It also explains why, *on some occasions, plaintiff had to pay amounts out of its own pocket to road contractors to get them to perform road construction work called for by timber sale contracts it received from the Forest Service. This interplay between timber purchaser and road contractor is not deemed material to the issue of the reasonable accuracy of the Forest Service estimates in this case.

9. Reid anticipated making a profit of some 10 percent on the road surfacing work. E. W. Reid testified that he felt the company probably did make this amount of profit on the road surfacing work, reflecting, undoubtedly, Reid's

Reid began performance of the road construction work in June 1970 and successfully completed this work in August 1973. During contract performance Reid maintained detailed job diaries wherein E. W. Reid recorded daily various job activities, labor crews, work problems, equipment usage, etc. E. W. Reid testified he recorded all major problems associated with performance of contract work. The compilation of job diaries was something E. W. Reid did as a matter of practice on all road construction work the company performed. The VCTS contract job diaries were in evidence and provided a contemporaneous account of the road construction work as it progressed.

Reid's claims embrace three main categories of road construction work, i. e., excavation work, clearing work, and minor reconstruction work, including the installation of a barbwire fence. Reid advances claims under one or more of these categories for each of the seven roads on which construction work was performed.

Determination of whether the Forest Service work and cost estimates were grossly inaccurate, as advocated by plaintiff, has been primarily a factual inquiry. Under such circumstances, plaintiff has the burden of establishing by a preponderance of the evidence that these estimates were, in fact, grossly, or unreasonably, inaccurate. Each claim has been given full and careful consideration in the detailed findings of fact accompanying this opinion. Only a summary of those facts will be set forth when discussing each claim hereinafter in order to place the claim and the conclusionary findings related thereto in proper perspective.

### A. Claims based on excess excavation.

### 1) Road 1222D, Segment B.

This new construction road segment was 3.2 miles in length. The contract estimated that 27,390 cubic yards (c.y.) of unclassified material (consisting of solid rock, rippable rock and common material) would be excavated from this road segment. The contract estimated the cost of this excavation work to be $8,804. Reid claims it removed some 41,288 c.y. of material, or 13,898 c.y. in excess of the amount of material estimated in the contract. It seeks $22,236 as the costs it incurred in excavating this excess material. These claimed costs could not be verified from an audit of Reid's books and records. Instead, these costs reflected computations, opinions, and assumptions by E. W. Reid.

The basis for Reid's claim that the Forest Service excavation estimate on this road segment was grossly or unreasonably inaccurate rests on a survey report by Jan M. Wick (Wick), a civil engineer licensed in the States of Oregon and Washington. Wick was a member of Tenneson Engineering Corporation, a Dallas, Oregon, civil engineering firm hired by Reid to substantiate its excavation claim on this road segment and also its excess clearing claims on this road and on other roads.

There is nothing in Reid's daily job diaries which bears on the excavation claim now advanced by Reid. Wick investigated and surveyed this road segment in September—October 1973. He measured this road as constructed (as built) by Reid.[10] He made no effort to obtain the cross-section drawings of this road segment, nor did he make any effort to obtain measurements

---

considerable experience in this area. E. W. Reid further testified, however, that the total job was performed at a "disastrous loss." The Forest Service, based on Reid's VCTS road construction work performance, found Reid to be a competent and efficient road surfacer but viewed Reid to be inefficient and rather inexperienced in excavation, clearing and minor reconstruction work. The record suggests that Reid's claims herein might well be the germination of the seeds of its inexperience and inefficiency in these work areas.

**10.** Wick measured 37,288 c.y. of excavation. He advised Reid in his report on his survey that " * * * An arguable case could be made for an additional three or four thousand yards of excavation. Since this is an as-built project, we cannot accurately determine the additional yardage; 37,000, however, is the minimum." Reid added 4,000 c.y. to Wick's measured figures of 37,288 c.y. to arrive at its claim figure of 41,288 c.y. The record will not support, in any event, the addition of this 4,000 c.y. to Wick's measured excavation figure.

based on the road segment as designed by the Forest Service. The cross-section drawings inadvertently destroyed at some time in late 1973, may have been available to Wick in September 1973 had he asked the Forest Service for them. There is no question but that the cross-section drawings would be critical documents for one called on to determine with any degree of reliable accuracy the amount of excavation removed from a newly constructed road. Accepted engineering practice would require that one obtain such drawings before making excavation determinations on which one hoped others would place some degree of reliability.

Because he did not have the cross-section drawings, Wick had to make assumptions as to where the original ground was before excavation took place. Analysis of Wick's survey study disclosed both technical and arithmetical errors. For reasons detailed in the findings of fact Wick's excavation determinations were most unreliable.

Defendant produced Steven P. Ness (Ness), a licensed civil engineer in the State of Oregon, as an expert witness. He testified that without the cross-section drawings, which had been destroyed when he conducted his survey study of Road 1222D, seg. B, in November 1976, it was impossible to determine where the original ground was for purposes of determining the amount of excavation removed from this road segment during contract performance. He further testified that one could only guess as to the amount of excavation actually removed from this road segment. After his survey study of this road segment, which involved measurements,[11] and after study of the contract plans and specifications relating to construction of this road segment, Ness offered the opinion that Reid had overbuilt the road. This opinion was corroborated by the testimony of Forest Service personnel intimately familiar with the construction of this road segment. The significance of this fact is that Reid undoubtedly excavated more material than was required to be ex-cavated by the contract plans and specifications.

Ness was of the opinion that the Forest Service excavation estimate of 27,390 c.y. for this road segment was reasonably accurate. He further testified that a reasonable margin of error relative to excavation estimates on Forest Service roads would range from 15 to 20 percent. Finally, Ness observed that Wick's excavation measurement figure of 37,288 c.y. and his own excavation measurement figure of 34,064 c.y. represented as-built measurements and were not comparable in any meaningful way to the contract estimated figure of 27,390 c.y., which was an in-place measurement figure. Ness was a most persuasive witness.

Plaintiff has failed to carry its burden of showing by a preponderance of the evidence that the Forest Service's estimate of excavation that would be required on Road 1222D, seg. B, was grossly or unreasonably inaccurate. Accordingly, any cost in excess of the contract cost estimate for this work must be borne by Reid.

### 2) Road 1330.

This existing single lane road was 3.9 miles in length. The construction work on this road was designed to widen it into a double lane road. The contract estimated that 19,529 c.y. of unclassified material would be excavated from this road. The contract estimated the cost of this excavation work to be $14,821. This road involved a lot of difficult rock work, a fact known to all the parties before the prime contract and the subcontract were executed. Reid claims it removed 52,200 c.y. of material, or 32,671 c.y. in excess of the amount of material estimated in the contract. It seeks $32,963 as the costs it incurred in excavating this excess material. These claimed costs could not be verified from an audit of Reid's books and records. As was the case with respect to the Road 1222D, seg. B, claim, these costs reflected computations, opinions, and assumptions by E. W. Reid.

11. Ness surveyed and measured this road segment for purposes of comparing his results with Wick's results. Ness computed an as-built excavation figure of 34,064 c.y.

Reid arrived at its total excavation figure in the following fashion. Reid claims it hauled 5,220 truckloads of material.[12] Each truck was considered to have a 12 c.y. load capacity and to have been fully loaded on each haul occasion. By giving consideration to the swell factor, Reid reduced the quantity haul of each truck from 12 c.y. to 10 c.y.[13] Reid accordingly concluded that on the basis of truckload hauls, it excavated 52,200 c.y. of material from Road 1330 (5,220 × 10 c.y. = 52,200 c.y.). Reid's truckload approach to determining the amount of material excavated from Road 1330 was not very persuasive. Indeed, an entry in Reid's job diary of October 12, 1971, pointedly suggests that truckload measurements are not very reliable.

Reid completed the excavation work on Road 1330 on June 30, 1971. Reid's daily job diary for that date discloses that Reid had excavated 38,500 c.y. of material on Road 1330.[14] This excavation figure represents material removed from the ground. To make this excavated and measured material comparable to the in-the-ground contract excavation estimate (19,529 c.y.), the application of swell factors seems appropriate. Using the lowest range of industry swell factors, i. e., 55 percent swell for solid rock, 50 percent swell for rippable rock, and 15 percent swell for common material, an average swell factor of 40 percent is obtained. Using this 40 percent swell factor, the 19,529 in-the-ground estimate expands to a measured excavation figure of some 27,340 c.y. If the highest range of industry swell factors is utilized, i. e., 75 percent swell for solid rock, 60 percent swell for rippable rock, and 35 percent swell for common material, an average swell factor of 56 percent would produce an expanded measured excavation figure of some 34,175 c.y. Interestingly enough, plaintiff nowhere in its proposed findings or in its brief relies on the job diary excavation figure of 38,500 c.y. as an alternative basis for an excess excavation claim. One could conclude that plaintiff and Reid believe, and rightly so it might be added, that this figure was not grossly inaccurate when appropriate swell factors were utilized and a reasonable margin of estimate error allowed in comparing it with the in-place contract estimate.

The record also indicates that Reid over-excavated and over-built Road 1330 to some degree. Reid admits that his rock blasting did produce excessive excavation. These activities would result in the excavation of materials in excess of that required by the contract plans and specifications.

Giving due regard to the above discussion, as amplified in the findings of fact, it is concluded that plaintiff has failed to establish by a preponderance of the evidence that the Forest Service estimate of excavation that would be required on Road 1330 was grossly or unreasonably inaccurate. Accordingly, any cost in excess of the contract cost estimate for this work must be borne by Reid.

### B. Claims based on excess clearing.

The contract required the clearing of areas on each side of five of the seven roads

12. Reid's daily job diary entry for June 29, 1971, indicates that 5,201 truckloads were utilized to haul the excavated material from Road 1330. There are no further entries in the job diaries subsequent to June 29, 1971, as to truckload excavation on Road 1330. There is no explanation in the record for the 5,220 truckloads figure used by Reid.

13. Swell is the term used to express the expansion factor when in-the-ground materials are excavated from their natural site and placed on trucks for measurement purposes. Reid used a swell factor of 1 c.y. for rippable material, 5 c.y. for solid rock; and allowed no swell factor for common material. These swell factors served to cause Reid to reduce the haul capacity of each fully loaded truck from 12 c.y. to 10 c.y. Reid's swell factors were not in accord with swell factors commonly accepted in the construction industry. Accordingly, Reid improperly minimized the swell factor and thus inflated, to some degree, his total truckload excavation figure. Moreover, the record is far from clear that each truck was fully loaded on each and every haul.

14. E. W. Reid at trial tried to explain away this diary entry by claiming that he meant to indicate that this 38,500 c.y. figure represented excess excavation. However, the format of his job diary entries and the record as a whole is against any such construction of this diary entry.

on which construction work was to be performed. These roads (and their lengths) were Road 1222D, seg. B (3.2 miles), Road 1330 (3.9 miles), Road 1222, seg. A (9 miles), Road 1222N, seg. A (1.5 miles), and Road 1222N, seg. B (3.1 miles). Road 1222D, seg. B and Road 1222N, seg. B were newly constructed roads whereas the remaining roads were old existing roads. The clearing areas were deemed to encompass 5 feet beyond the top of the cut on one side of the road and 5 feet beyond the toe of the fill on the other side of the road. When construction work began on these roads, the clearing areas on each of these roads were tagged with blue flags. As a result, during contract performance Reid was aware of the clearing limits on each of the roads.

The contract estimated that the total clearing acreage on these roads would be 68.3 acres and estimated that the cost of this work would be $35,474. Reid claims it cleared 90.3 acres, an excess of 22.0 acres over the clearing acreage estimated by the Forest Service in the contract. Reid seeks to recover $10,367 as the costs it incurred in clearing areas in excess of the contract clearing estimates.[15] These claimed costs could not be verified from an audit of Reid's books and records. In substance, Reid merely determined a per acre clearing cost figure from the contract clearing acreage estimates and the contract cost estimates for each road and multiplied those per acre clearing cost figures by the number of excess acres cleared on each road to arrive at the total clearing claim figure.

The basis for Reid's claim that the Forest Service clearing acreage estimates on the above five roads were grossly or unreasonably inaccurate rests on the clearing acreage survey report of Wick relative to one road only, i. e., Road 1222D, seg. B. Wick, as noted earlier, investigated and surveyed Road 1222D, seg. B, in September—October 1973. At this time, the clearing limit identification flags and/or stakes were, for the most part, gone. Accordingly, Wick was not always sure where the clearing limits were.

Wick's explanation of the basis for his clearing measurements was not entirely clear and/or consistent in the record.[16] Moreover, his testimony was not supported in certain respects by his survey notes on his clearing acreage measurements. For example, while Wick maintained his measurements were based on clearing areas of 5 feet on each side of Road 1222D, seg. B, his survey notes reveal clearing measurements at various stations ranging from 9 feet to 40 feet from the road. Such measurements would obviously produce excess clearing acreage. Further, the reliability of Wick's clearing acreage measurements is most questionable. General Survey practice dictates that clearing acreage measurements are done on a horizontal plane. Wick testified he used slope distance averages in his clearing acreage measurements. It is conceded that use of slope distance in such measurements increases the clearing acreage figure.[17] As a result, plaintiff's excess

15. At trial, plaintiff sought to recover $11,007 on the clearing claims. However, in its proposed findings of fact and brief, plaintiff made an adjustment, utilizing a clearing overage percentage of 0.2894 for each road, which served to reduce the claim to $10,367.

16. Wick had no idea how the Forest Service arrived at its clearing acreage estimates. In reaching its clearing acreage estimates, the Forest Service used the prism method. A prism is an instrument that enables one to determine tree spacings, tree diameters, etc. The prism method was an acceptable method for determining clearing acreage in a forest area.

17. Ness, the government's expert witness, utilized Wick's basic survey measurement figures

and made adjustments, based on his survey study of the clearing area, to convert Wick's slope distance average to a horizontal approach and arrived at a clearing acreage figure of 19.97 acres. This compares favorably with the Forest Service clearing acreage estimate for Road 1222D, seg. B, of 19.0 acres. Ness also conducted a clearing acreage survey on Road 1222D, seg. B. Because of the absence of clearing limit indicators, he too had trouble in defining the clearing area. He arrived at a clearing acreage overage figure of 23.9 acres but readily conceded his measurements overstated the clearing areas envisioned in the contract. Ness viewed the contract clearing estimates as reasonably accurate. Neither Wick's clearing acreage figure nor Ness' clearing acreage figure could be compared with the Forest

clearing acreage claim, dependent as it is on Wick's unimpressive testimony and survey report, lacks reliability and credibility.

Wick computed the excess clearing overage percentage on Road 1222D, seg. B, to be 30 percent. Actually it was 0.2894 and it is the percentage figure now used by Reid in computing its excess clearing claims on the other four roads. Reid assumed that since a clearing acre overage occurred on Road 1222D, seg. B, such overages must have occurred on all the other roads on which clearing work was required. These other roads were not measured and/or surveyed.[18] Such an assumption is contrary to standard and acceptable survey practice and technique which views each piece of road as being different, especially in timbered areas.

Plaintiff has failed to carry its burden of proving by a preponderance of the evidence that the Forest Service clearing acreage estimates for the five roads in question were grossly or unreasonably inaccurate. *See Tree Preservation Co. v. United States, supra.* Accordingly, any costs in excess of the contract cost estimates for this work must be borne by Reid.

### C. Minor reconstruction work and barbwire fence.

#### 1) Drainage ditches.

The contract specifications (Item R 57) required "Minor Reconstruction" work to be performed on Road 1222, seg. B, and Road 1222D, seg. A, as shown on the contract plans or as staked on the ground. Both of these road segments were old existing roads. Road 1222, seg. B, was 3.2 miles in length and Road 1222D, seg. A, was 2.0 miles in length. The specifications defined minor reconstruction work as, *inter alia,* " * * * clearing of drainage ditches and drainage structures." The specifications also provided with respect to "Construction Methods" to be followed during minor reconstruction work that, " * * * All deleterious material and large stones encountered during the operation shall be removed. Materials so removed will not be permitted to remain on road shoulders or in ditches."

The contract estimated the cost of minor reconstruction work on Road 1222, seg. B, to be $1,690. This cost estimate was later raised to $4,343.[19] The contract estimated the cost of minor reconstruction work on Road 1222D, seg. A, to be $733. Reid claims it incurred costs of $8,501 in performing the minor reconstruction work on Road 1222, seg. B, and that it incurred costs of $1,329 in performing the minor reconstruction work on Road 1222D, seg. A. Accordingly, it seeks to recover the difference between the contract estimated costs and the actual costs it did incur. In the case of Road 1222, seg. B, Reid claims excess costs

---

Service estimate of clearing acreage on Road 1222D, seg. B, because of a lack of reasonable definitiveness as to where the original clearing limits were. Both the Ness and Wick clearing survey results included overclearing beyond contract requirements.

**18.** Wick did not investigate these other roads when he surveyed and measured Road 1222D, seg. B, in September—October 1973. It was only after defendant challenged Reid's assumptions in its pretrial submission in October 1976, that Wick, at the request of Reid's attorney, returned to the VCTS area in December 1976 to walk and/or ride the roads in question in order to justify the assumption, previously made, that Road 1222D, seg. B, was representative of all the roads to be cleared so as to warrant use of the excess clearing overage percentage obtained on Road 1222D, seg. B, on all of the four other roads. Such an approach rests on the dubious assumption that a clearing acreage

error on one road would be repeated on each and every other road on which clearing work was to be performed. There was no reliable evidence in the record to support such an assumption.

**19.** Reid, early in contract performance, complained that the minor reconstruction work called for under the contract greatly exceeded the contract cost estimate. As a result, the work was restaked and the contract cost estimate increased from $1,690 to $4,343. Plaintiff and the Forest Service signed a contract modification dated October 21, 1970, establishing $4,343 as the cost estimate for minor reconstruction work on Road 1222, seg. B. Reid's daily job diary records this problem and its resolution. These job diaries also served as a source for audit verification of the costs claimed by Reid for minor reconstruction work on Road 1222, seg. B, and on Road 1222D, seg. A.

of $4,158 ($8,501—$4,343); in the case of Road 1222D, seg. A, Reid claims excess costs of $596 ($1,329—$733).

Reid maintains that the excess costs it incurred were due to encountering solid rock at various spots in the ditchline areas on both roads. The rock problems, according to E. W. Reid, were less severe on Road 1222D, seg. A, than on Road 1222, seg. B. E. W. Reid believed that since this was identified as "Minor Reconstruction" work he would not have to blast or rip rock from ditchlines. He visualized his job as merely cleaning out the ditchline by pushing debris therefrom and/or blading and reshaping the drainage ditches into their original design profile. He did not expect to find rock in the ditchlines.

The presence of rock in these areas was not unusual nor unforeseeable. Indeed, the totality of the contract specifications (Item R 57) relating to minor reconstruction work suggests that rocks and large stones could be encountered in the road areas, including the ditchlines. The record discloses that sections of Road 1222 were originally constructed through large boulders and solid rock. E. W. Reid testified that rock was present in the ditchline because the ditchline had not been properly constructed in the first place. However there is no reliable evidence in the record to support this allegation. The record does indicate that as a result of logging operations over forest roads such as these, the ditchlines on said roads become, in some cases, totally different from their original design profile. Interestingly, Reid's detailed job diaries contain no entries reflecting rock problems in the ditchlines of these roads.

Reid intimates that because its costs of performing the work exceeded the Forest Service cost estimates for said work, the Forest Service estimates must be considered unreasonably inaccurate.[20] No such conclusion can be reached on the basis of this record. Indeed, the record suggests that

Reid's inefficiency and inexperience in excavation, clearing and rock removal work undoubtedly increased its operational costs. The situation with respect to the minor reconstruction claims seems to fit into the mold of those cases where, under a fixed-price contract, the contractor assumes the risk of unexpected costs as well as the risk of its failure to appreciate the problems of the work undertaken. See Sperry Rand Corp. v. United States, 475 F.2d 1168, 1175–76, 201 Ct.Cl. 169, 181 (1973).

The record on these minor reconstruction claims leaves much to be desired. On the basis of the existing record, it is concluded that plaintiff, who must carry the burden of persuasion on these claims, has failed to establish by a preponderance of the evidence that the Forest Service cost estimates on the minor reconstruction work on Road 1222, seg. B, and Road 1222D, seg. A, were grossly or unreasonably inaccurate. Any costs in excess of the contract cost estimates for the work on these roads must be borne by Reid.

2) Barbwire Fence.

The contract required the installation of a 700-foot barbwire fence to tie in with an existing fence along a certain portion of Road 1222D, seg. B. The purpose of the fence was to prevent cattle from getting on the roadway. The contract estimated the cost of this work item to be $85. It cost Reid $247.63 to install this fence. Reid, claiming that the Forest Service cost estimate for this work was unrealistically inaccurate, seeks to recover the difference between the above figures, or $162.63. The parties in their proposed findings and briefs proffered very little on the merits of this claim.

Plaintiff admits that the claim is not significant in terms of dollars. Plaintiff further concedes that it is not complaining that the work quantities and costs, in general, were not exactly what the Forest Ser-

---

**20.** This total cost approach to damages is not looked on with favor in any event since it rests on the assumption, *inter alia,* that the contractor in no manner contributed to the situation by way of inefficiency, etc. See *Boyajian v. United States,* 423 F.2d 1231, 1243–44, 191 Ct.Cl. 233, 253–54 (1970).

vice estimated in the contract. "The complaint is that the estimates in some cases were approximately 270 percent off (road 1330 for example)." (Plaintiff's main brief, p. 5.) Here, the variation between the costs incurred ($247.63) and the estimated cost ($85) is some 35 percent. On this record, such a variation on a claim of this type does not impress one as being a material and significant variation. *See Peter Kiewit Sons' Co. v. United States, supra.* Plaintiff really puts this claim forward as illustrative of "the inadequacy of Forest Service Engineering" in general and as supportive of the other larger claims it advances. (See plaintiff's main brief, p. 12.)

It would appear that the Forest Service prepared this fence cost estimate from data set forth in the Forest Service Cost Estimating Guide.[21] Further, it would appear this estimate was prepared from data available in the October 1969 Estimating Guide. There is no hard evidence in the record as to when and where Reid purchased the fence material or whether the fence installed was identical to or of better quality than the fence intended by the Forest Service estimate. As far as can be determined, Reid purchased the materials and installed the fence sometime in 1972. It is not unreasonable to expect that from October 1969 to 1972, changes in wages and material costs and other factors might have served to increase costs. Accordingly, the Forest Service cost estimate may well have been reasonable at the time it was arrived at in 1969. On the basis of this record, it would not be proper to view such a 1969 estimate as unreasonable merely because it cost Reid more to install the fence in 1972. It is also noted that before the prime contract and the subcontract were entered into, plaintiff and/or Reid could easily have verified the cost of 700 feet of fence material from a supplier and could easily have estimated the labor costs for installation thereof. Such an undertaking would not have involved any surface or subsurface investigation. Unlike the other work and cost estimates in issue in this case, the fence cost estimate was easily verifiable by plaintiff and/or Reid had they chosen to do so. This observation serves to dampen whatever appeal Reid's fence claim might otherwise have had.

Under the circumstances, plaintiff has failed to carry its burden of proving by a preponderance of the evidence that the Forest Service cost estimate relative to installation of the barbwire fence along Road 1222D, seg. B, was grossly or unreasonably inaccurate. As a result, Reid must bear the excess costs incurred in performing this work. *See Sperry Rand Corp. v. United States, supra,* 475 F.2d at 1175–76, 201 Ct.Cl. at 181.

### III

In summary, plaintiff has failed to carry its burden of persuading the trier of fact that the Forest Service VCTS road construction work and cost estimates were grossly or unreasonably inaccurate. This conclusion serves to emasculate the relentless and persistent arguments of plaintiff that the Forest Service misrepresented that it had conducted reasonably intensive surface and subsurface investigations for the purpose of road construction work design, that Forest Service personnel who conducted said investigations and who prepared the road construction work design and estimates were deficient in road construction experience, education, techniques, competence and engineering practices, and that the total Forest Service engineering work on the VCTS road project was inadequate and negligently prepared. Since the work and cost estimates have been found to be reasonably accurate, under the circumstances of this case, plaintiff's derogatory attacks on the Forest Service's preparatory work in arriving at such estimates must be rejected. Plaintiff's petition should be dismissed.

---

21. This Estimating Guide was based on cost data supplied by road contractors who had worked on prior Forest Service road contracts.

*Thus, there is reason to believe the Forest Service fence cost estimate had an empirical base (see finding 34(b); see also finding 23(a)–(e)).*

## CONCLUSION OF LAW

Based upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.