**Edward J. TROISE, Sr., d/b/a E.J.T. Construction Management Corp., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 245–88C.**

United States Claims Court.

July 17, 1990.

---

William R. Chambers, McLean, Va., for plaintiff. Barry D. Rhoads, Watt, Tieder, Killian & Hoffar, of counsel.

Ann L. Springer, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Lt. Col. Billy Smith, Jr., U.S. Air Force, Office of the Judge Advocate Gen., of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment. Of the many issues raised by the cross-motions, the principal issue that can be resolved is whether the Government's assessment of liquidated damages against plaintiff after plaintiff failed to complete contract performance on schedule is void as a penalty despite the Government's correcting the method of calculation before assessment.

## FACTS

The following material facts are undisputed, unless otherwise noted. On September 20, 1982, the United States Department of the Air Force (the "Air Force"), Dover, Delaware, awarded Contract No. F07603–82–C0046 ("contract 0046") in the amount of $2,359,000.00 to Edward J. Troise, Sr., and E.J.T. Construction Management Corporation, a Joint Venture ("plaintiff"). The contract pertained to Phase III of a four-phase renovation project at Dover Air Force Base ("Dover"). As described in the Invitation for Bids, Phase III work constituted renovating ten blocks of housing units, each block containing 19 to 26 individual housing units. Plaintiff previously performed Phase II contract work for the same renovation project at Dover. Plain-

tiff was low bidder on the contract by $259,000.00 and offered a bid that was $1,515,049.00 lower than the Air Force's estimate.

Contract 0046 required plaintiff to perform major renovation work in the housing units, encompassing, but not limited to, installation of kitchen cabinets, heating, ventilation, and air conditioning equipment, and bathroom vanities; wall and ceiling repairs; and installation of exterior privacy wood fencing. The period for contract performance was 450 days, which commenced within ten calendar days after issuance of the Notice to Proceed on November 4, 1982, and ended on or about January 29, 1984. Plaintiff provided the Air Force with a contract performance schedule estimating a 417–day calendar performance period ending on approximately December 29, 1983. The contract provided for a 90–calendar day period to complete each of Blocks One and Two and 60 calendar days to complete each successive block.

On August 4, 1982, prior to the receipt of bids, the Air Force amended certain specifications contained in the Invitation for Bids. The amendments later were incorporated by reference into contract 0046. One amended specification altered the contract's liquidated damages clause. Under the amendment the charge for each day of delay was increased from $64.74 to $223.94, with the notation that "[l]iquidated damages shall be assessed by unit." Also amended was the specification concerning Phase III kitchen cabinets. The pre-amendment language read, in pertinent part: "At the contractor's option, cabinets shall be constructed as specified hereinafter and shall conform to ANSI A161.-1...."[1] On August 4, 1982, the language was altered by deleting "At the contractor's option" from the wording.

### 1. *Kitchen cabinet claim*

In bidding the contract, plaintiff assumed that it would be able to use the same cabinets that it supplied under the Phase II

---

**1.** The Phase II kitchen cabinet specifications, also completed by plaintiff, were identical to the

contract. At the Phase III pre-performance conference, plaintiff's representative did not question the revised specifications. On December 23, 1982, plaintiff submitted to the Air Force a cabinet manufactured by Boro Woods Products Co., Inc. ("Boro"). The Air Force disapproved that cabinet on January 18, 1983, on the grounds that the "Classic" cabinet was not constructed from materials outlined in the Phase III specifications. As the notes to the contractor on the submittal form state with respect to submittal number 9:

Item # 1:

 a. Drawer sides and backs shall be ½" hardboard as specified.

 b. Drawer fronts and doors shall be hardwood as specified.

 c. Hardwood blocks shall be used in lieu of plastic corner blocks.

 d. Door hardware shall be magnetic type catches as specified.

 . . . .

Item # 8:

 a. Bottom of cabinet shall be braced with hardwood blocks.

 b. Sample of wall cabinets not submitted as required.

 c. Request drawer fronts be nailed to sides of drawers.

Plaintiff's expert in woodworking and furniture design, Paul E. Rumbaugh, finds the notations on the Material Submittals "inept and confusing." In his affidavit, he states:

Item 1(a) states "Drawer sides and backs shall be ½ inch *hardboard* as specified". The specs actually require "½ inch *hardwood*"! Item 1(b) states "Drawer fronts and doors shall be hardwood as specified". The specs actually require doors to be "hardwood plywood"! Item 1(c) Plastic corner blocks are a totally satisfactory substitute for wood corner blocks and are used extensively. Item 1(d) Spring loaded, self-closing hinges as used on the sample improve quality compared to regular hinges and troublesome magnetic catches.

Phase III language before amendment.

(2) Item 8(a) "Bottom of the cabinet shall be braced with hardwood blocks". Hardwood blocks *do* brace the bottom of the cabinet. Item 8(c) "Request drawer fronts to be *nailed* to sides of drawers". "Nailing" in cabinet construction is a very poor method of joinery, it is not recommended and is rarely if ever used.

Affidavit of Paul E. Rumbaugh, Mar. 5, 1990, ¶ 8 (emphasis in original). Mr. Rumbaugh does concede, however, that there were two valid bases for rejecting submittal number 9. First, the sides of the drawer should have been constructed of either ½–inch hardwood or 5–ply hardwood plywood. Rumbaugh Aff. ¶ 8b. Second, while the specifications did not require that the painted backs of the cabinet doors, drawers, and edges be covered in plastic, had these items been so covered, the Classic cabinet would have been equal to submittal number 63. Submittal number 63 was listed on the "Material Approval Submittal" as satisfactory. *Id.*

Defendant asserts that on March 23, 1983, a Boro representative discussed the cabinet submissions with Contracting Officer Thelma O. Gabrielson. According to Air Force phone logs, "Lou from Boro Wood" claimed that he had told "Eddie Troise," prior to bid submission, that Boro did not make a cabinet that would comply with Phase III specifications. The phone logs appear to be inadmissible hearsay and are not considered in ruling on defendant's motion. Defendant can attempt to introduce them at trial under the business records exception to the hearsay rule. Fed.R.Evid. 803(6).

Contracting Officer Gabrielson, by letter dated April 7, 1983, informed plaintiff that Haas Cabinet Company ("Haas") was able to produce a cabinet line that met Phase III requirements. Through submission No. 63, plaintiff submitted a cabinet manufactured by Haas. Master Sergeant Leland M. Webb rejected the submittal on the grounds that "[p]article board sides and shelves are not an approved equal to the material specified...." Plaintiff, through its expert Mr. Rumbaugh, challenges the propriety of the Air Force's disapproval of the Haas cabinet. Mr. Rumbaugh concludes that the Haas cabinet, for normal use, is equivalent to the cabinet specifications. Mrs. Gabrielson appears to share the same view. As she wrote in February 28, 1985 internal memorandum:

On 6 May 1983 the Government directed the Contractor to submit a cabinet that met the specifications. The Contractor submitted a Haas Cabinet (the same manufacturer that the Contractor was told in the LGCC letter of 7 Apr 83 could meet the specifications); however, the cabinet was of the same construction of those previously submitted. This submittal was disapproved. (Had the Contractor submitted this cabinet initially, it may have been approved. The Contractor is not aware of this, to the best of my knowledge; however, I feel it is important for you to know.)

(Citations omitted.)

In all, the Air Force rejected plaintiff's first five cabinet samples for failure to meet "or equal" the specifications. On June 28, 1983, the Air Force approved plaintiff's use of a modified version of the "Classic" cabinet by Boro. A commercially available version of the cabinet had been rejected by Air Force officials the previous January.

Edward J. Troise, Jr., plaintiff's President, by a letter dated July 13, 1984, expressed dissatisfaction with the Air Force's interpretation of the specifications. In his view the Air Force required plaintiff to provide cabinets that were different from those "customarily and normally furnished for housing throughout the industry." W.F. McFaul, Chief of the Engineering and Environmental Planning Branch at Dover AFB, noted in a March 31, 1983 memorandum that requiring the cabinets to be made of "wood" and not "particle board" was possible, yet more costly to the contractor. Moreover, he states that the demand for all wood cabinets placed the Air Force's requirements beyond the standards accepted in the industry. Mr. McFaul wrote: "Cabinets as specified are not standard commercial practice. Substitution of particle board for wood is certified as equal by mfg.

Standard cabinets do not use wood for construction other than 'fronts.'" Upon the recommendation of Mr. McFaul, Air Force officials approved the use of cabinets constructed of ⅝–¾–inch particle board, on June 2, 1983.

After plaintiff installed the Boro Classic cabinet in the first two blocks of Phase III, a defect became apparent in the cabinet finish: The finish on many cabinets had become clouded and cracked. If the clouding and cracking was the result of exposure to water, the cabinet finish would run afoul of the National Kitchen Cabinet Association ("NKCA") standards incorporated into the contract. The Law Engineering Testing Company of Birmingham, Alabama, tested the Boro "Classic" or "custom" cabinet to determine whether it had the resistance to water, detergent, and household chemicals required by the NKCA standards. According to the testing company report, the finish on the Boro "Classic" cabinet became discolored as a result of the tests recommended by the NKCA.

### 2. *Freeze delay claim*

The cabinets were exposed to water during renovation. On or about December 26, 1983, water pipes froze and burst in 23 units under plaintiff's control. The break in the pipes was the result of sub-freezing temperatures in the units during renovation. Defendant submits the affidavit of Master Sergeant Clifford W. Stevens, who records daily climatological data at Dover attesting to the low temperature of 6–17 degrees. Water from the broken pipes in Block Two exacerbated the extent of damage to the kitchen cabinets' finish. Defendant asserts that resultant delays are chargeable to the contractor because the dip in temperatures was anticipated by local forecasts. Plaintiff asserts that the temperatures were lower than those forecast and as a result that plaintiff was entitled to a 60–day extension of contract performance. However, plaintiff does concede

liability for the freeze-related damage to units in Building 3505.

As to the requirement for heating the units during renovation, the contract provides, in pertinent part:

**6. TEMPORARY HEAT:** [2]

The contractor shall provide such temporary heat as is necessary to prevent injury to work or material through dampness or cold.... In unoccupied units, the temperature shall be maintained safely above freezing (and warm enough for construction activities and proper installation of materials) by the contractor, at all times, at no additional cost to the Government. The type of temporary heat to be used by the contractor must be approved by the Contracting Officer.

Contract 0046 incorporated Defense Acquisition Regulation ("DAR") clauses 7–602.5 and 7–602.13, 32 C.F.R. §§ 7–602.5, 7–602.13 (1983). Section 7–602.5(d) provides:

The contractor's right to proceed shall not be ... [terminated for default] nor the Contractor charged with the resulting damage if:

(1) The delay in the completion of the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to, acts of God, acts of the public enemy, acts of the Government in either its sovereign or contractual capacity, acts of another Contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, *unusually severe weather*, or delays of subcontractors or suppliers arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and such subcontractors or suppliers; and

(2) The Contractor, within 10 days from the beginning of any such delay (unless the Contracting Officer grants a further period of time before the date of

**2.** The provision appears as a subparagraph on page 01200–02 of the contract; the heading and number of the section are unknown.

final payment under the contract), notifies the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when, in his judgment, the findings of fact justify such an extension, and his findings of fact shall be final and conclusive on the parties, subject only to appeal as provided in the "Disputes" clause of this contract.

(Emphasis added.) D.A.R. § 7–602.13 provides, in pertinent part:

The contractor shall, without additional expense to the Government, be ... responsible for all damages to persons or property that occur as a result of his fault or negligence.... He shall also be responsible for all materials delivered and work performed until completion and acceptance or the entire construction work, except for any completed unit of construction thereof which theretofore may have been accepted.

The Contracting Officer gave verbal direction to plaintiff on February 14, 1984, to discontinue installation of the Boro Cabinets in Block Three until such time as the defects in the cabinet finish could be remedied. With a newly formulated finish, plaintiff was permitted to install the Boro Classic cabinet by mid-March. The following December, Boro representatives were permitted to renovate the kitchen cabinets with finish that failed. Plaintiff's claim for a time extension of 60 days was, however, denied for both Blocks Two and Three.

In autumn 1983 the Phase IV contractor, Roberts Construction Company ("Roberts"), had been selected and by December of that year had its cabinets submissions approved. Roberts proposed use of the Odyssey Tri–Pac cabinet in renovating the Phase IV units. After modification to the cabinet drawer guide system, Roberts was granted permission to install the Odyssey cabinets. Having experienced setbacks as a result of supplying the Boro cabinets, plaintiff sought out an alternate line of cabinets for installation in the latter blocks of Phase III. On September 11, 1984, plaintiff received approval for use of the Tri–Pac Odyssey cabinet in Phase III renovations.

### 3. *Vanity top claim*

Plaintiff charges that the improper rejection of the Boro Classic cabinet later spiraled into problems obtaining plastic laminate vanity counter tops. On November 4, 1984, plaintiff received a letter from Joseph A. Doherty, President of B & M Industries ("B & M"). B & M was plaintiff's supplier. Mr. Doherty wrote:

Due to delays caused by the unavailability of Westinghouse Micarta plastic laminate used for the vanity tops in Phase III Housing, B & M Industries, Inc[.] cannot supply the finished product in accordance with your production schedule. The problem arises in Micarta's inability to supply Hartson–Kennedy, who provides us with Post-form tops, with the formable product in less than ten weeks.

Mr. Doherty submitted samples of plastic laminated products, available from suppliers other than Micarta, at a job site meeting of November 13, 1984. On that same day, the Air Force verbally approved plaintiff's request to furnish a different brand and color of vanity tops from those originally described in the contract specifications. Plaintiff now asserts that it was under no duty to order vanity tops conforming to the original specifications at the start of contract performance and that the improper rejection of the Boro cabinet exposed plaintiff to later vanity top shortages. Plaintiff also contends that the Air Force wrongfully withheld approximately $137,700.00 as a result of a credit for fencing materials (next discussed), thereby hemorrhaging plaintiff's cash flow and rendering plaintiff financially unable to purchase the vanity tops. According to plaintiff, the delays suffered were not the result of its fault or negligence or that of its suppliers, so that plaintiff was entitled to an extension in the time of contract performance.

### 4. *Privacy fencing claim*

The contract specifications detail the materials acceptable for use in exterior woodwork, including the construction of privacy fences. Division 6, § 06100, ¶ 5(A), "EXTERIOR WOODWORK," reads:

Lumber selected shall be in accordance with species and grades in the following table:

| Grading Association | Species | Grade |
|---|---|---|
| Northeastern Lumber Manufacturers Assoc. | Spruce, Eastern | No. 1 Dim. |
| Western Wood Products Association (WWPA) | Cedar, Incense | C Select |
| | Cedar, Western Red | C Select |
| West Coast Lumber Inspection Bureau (WCLS) | Cedar, Western [R]ed | C |

Plaintiff made its first submittal of fencing material on December 30, 1982, which was subsequently rejected by the Air Force on January 6, 1983. By letter dated January 19, 1983, Mr. Troise, Jr., complained to Contracting Officer Gabrielson:

As indicated in our submission and telephone conversations with the contractor and sub-contractors involved, the materials specified for use in this contract are those that are utilized for construction of furniture; not exterior fencing. Please understand that furniture grade material cannot be utilized for obvious reasons and furthermore, it is not made available by suppliers to be used where exterior grades of lumber are normally required.

The contracting activity responded by issuing Modification P00011 on June 13, 1983. The modification deleted paragraph 5(a), above, and in its place substituted the following:

Exterior Woodwork: All exterior woodwork shall be kiln dried southern pine, .40 salt treated. Grade or board lumber shall be No. 1 common and grade dimensional lumber shall be No. 2 and better.... Grading of lumber shall be in accordance with the Southern Pine Inspection Bureau of Northeastern Lumber Manufacturers Association....

As Mr. McFaul explained in a memorandum of June 3, 1983:

This change is mandatory to supply a more suitable quality of lumber for the wooden fences. The lumber specified is of a quality that exceeds the quality which is required for the intended use. The change incorporates a more suitable quality of wood which will produce a more durable finished product....

Observing that the modification might cause changes in "either the contract price or performance time, or both," the Air Force invited plaintiff to submit a written statement, within 30 days, detailing the nature and extent of any change. Plaintiff submitted a request for an upward adjustment of the contract price in the amount of $8,439.89, and the parties met to discuss the proposal. Plaintiff and the Air Force were unable to reach accord. Anticipating a credit to government accounts, Air Force officials found plaintiff's proposal for an increase to the contract price unacceptable. As Mrs. Gabrielson summarized in a memorandum of April 18, 1984:

The contractor has refused to negotiate a credit to the Government on ... [the cost of Modification of P00011] He contends he didn't bid the job using number one grade cedar ... and therefore the government cannot take money out of the contract that was never there in the first place because he didn't plan to use the more expensive products. After several attempts at negotiation, it was decided to issue a unilateral modification.

Mr. Troise, Jr., explains how he computed plaintiff's bid for the fencing:

> During the Phase II renovation, the Specification for the wood fences required the use of C Select, Incense or Western Red cedar. Because the required cedar was unavailable for use, and was also furniture grade lumber not intended for use as exterior fencing material, the United States authorized EJT to use No. 1 fence grade cedar.
>
> The Exterior Woodwork Specification for Phase III was exactly the same as the Phase II Specification with the addition of Eastern Spruce, No. 1 Dim. to the Phase III Specification.
>
> Based upon the continued unavailability of the required cedar, the recommendation of experts in the lumber industry and my prior dealings with the United States in Phase II, I based EJT's bid for fencing material on top quality spruce fencing; the only fencing material available for quotation at the time of bid.

Affidavit of Edward J. Troise, Jr., Mar. 5, 1990, ¶¶ 6–8.

In preparing their calculations on the impact of Modification P00011, contracting officials solicited quotations from six lumber distributors. Quotations were solicited from two Dover area firms; one firm in Atlanta, Georgia; and three firms in Portland, Oregon. Only the Neidermeyer–Martin Company of Portland, Oregon, responded to the Air Force's inquiry with a quotation. Additionally, Contracting Officer Gabrielson's April 18, 1984 memorandum shows that contracting officials spoke with Mrs. Nydam of Quabaug Lumber Distributors. The memorandum reflects that Mrs. Nydam told the Air Force that the rate of inflation in the lumber market since August of 1982, the period just prior to plaintiff's bid, was 18.7 percent. Using the figures obtained, the officials calculated that the Air Force was entitled to a credit of $137,699.39. By issuance of Modification P00021, on March 19, 1984, the Air Force decreased the contract price by $137,699.39.

The parties dispute what type of lumber plaintiff planned to furnish at the time plaintiff submitted its bid. Plaintiff claims that it made its Phase III bid on the basis of Eastern Spruce prices, and submits a September 22, 1982 lumber quotation from Masten Home Centers of $73,390.86. Defendant relies on a January 19, 1983 letter from Mr. Troise, Jr., stating that the lumber disapproved by Air Force inspectors was "the same exact material which was utilized for Phase II...." Plaintiff made its Phase II bid on the basis of "fence grade Cedar" and was permitted to use "fence grade cedar" during the Phase II renovations.

### 5. *HVAC installation claim*

As part of its renovation work, plaintiff was obligated to install new systems for heating, ventilation, and air conditioning ("HVAC"). During the pre-final acceptance inspection of units in Block One, Air Force inspectors noticed that nonconforming HVAC systems had been installed in a majority of the units. On September 30, 1983, a meeting of the Contract Management Branch was convened, at which the nonconforming HVAC systems were discussed. As minutes of that meeting reflect: "Mr. Rose brought out the fact that out of 20 units only 4 units had the approved air handler installed. Model UHMA was installed and model VHQA was approved for installation...." Additionally, "a thorough review of all the submittals" revealed 17 separate instances where the installed system fell below the standards required by the specification. Plaintiff was required to remove the nonconforming systems and install correct, approved equipment.

Defendant asserts that the Air Force first learned that nonconforming equipment had been installed at the time of the September 19 inspection. William L. Campbell, an Air Force Inspector on the project, observed that during his visit to plaintiff's storage facility, conforming HVAC equipment was properly invoiced and inspected. Mr. Campbell expressed no view as to how nonconforming equipment came to be installed in the housing units.

Moreover, in his October 31, 1983 letter, Mr. Troise, Jr., admitted:

> [P]lease be advised that we are as disturbed as the government is regarding the oversight on the part of our [Quality Control Inspector] Mr. [Mears] in detecting the Block 1 HVAC equipment problem when it originally took place. However, it appears as though this unfortunate incident happened as a result of other parties; namely the HVAC installer, Eastern Shore Energy. Be assured that had they advised us of any difficulty, we obviously would have dealt with them at that time. We realize that this is not a justification for Mr. [Mears'] oversight but surely you can understand that such "human errors" do sometimes occur.

Plaintiff responds to defendant's motion with the "belief" of Mr. Troise, Jr., that the Air Force knew nonconforming HVAC systems were being put in place and "purposely waited until the day of final inspection to 'discover' the discrepancy." Troise Aff. ¶ 13.

### 6. *Wall refinishing claim*

Contract provision Division 9, section 9900 ¶ 6 required the contractor to repair defects such as cracks, holes, and punctures in wall surfaces prior to painting. Plaintiff points to the fact that Air Force drawing notes entitled "GWP/Plaster Cracks & Estimated Extent" indicate that 2,035 feet of damage were estimated for repair in Block One. Plaintiff actually repaired 3,764 linear feet of damage—an increase of 85 percent over the Air Force's estimate—according to a February 28, 1985 memorandum of Contracting Officer Gabrielson responding to plaintiff's claim. Joseph H. Dietz, Chief Family Housing, reported in minutes of a June 2, 1983 meeting of Air Force personnel to discuss the delay in the Phase III Renovation Project that the wallboard "repair[s] have exceeded the estimates." Defendant asserts that the estimate was reasonable under the circumstances and that plaintiff has not demonstrated that the discrepancies in the estimate resulted in any of the claimed delays. Moreover, as Mrs. Gabrielson recounts in

her February 28, 1985 memorandum, the note at the bottom of the drawing upon which the estimates appear reads:

> Dimensions and quantities ... are shown nominal for the purpose of estimating only. Exact dimensions and quantities must be ascertained by the Contractor for the purpose of equipment, supplies and materials....

### 7. *Liquidated damages claim*

By Modification P00010, effective April 4, 1983, the return date for units in Block One, the Air Force again modified the liquidated damages provision of plaintiff's contract. The new provision calculated the Air Force's damage on the basis of two cost factors. Modification P00010 reads, in pertinent part:

> The liquidated damage charges per day are as follows:
>
> (1) $12.28 is the charge for loss of BAQ [Beneficial Allowance for Quarters] *for each family housing unit for each day* beyond the specified performance period until completed and accepted by the Government.
>
> (2) $211.66 is the charge per day for Supervision, Inspection, and Contract Administration *for each day* beyond the specified performance period expiration until its acceptance by the Government.

(Emphasis added.) Under the new cost formula, the Air Force would assess liquidated damages for BAQ based upon both the number of units and the number of days of delay; the contract administration costs would be uniform for each day of delay, regardless of the number of delayed units. The prior formula assessed $223.94 worth of damages per unit, for each of delay. Mr. Troise, Jr., signed Modification P00010, on behalf of plaintiff, on May 9, 1983.

Plaintiff completed renovations on Block One and effected a return to the Air Force of all of the units in that block by December 20, 1983. The scheduled completion date for Block One was April 4, 1983. In an effort to mitigate damages, the Air Force had accepted individual units for return during the period between November 25 and December 20, 1983. On the basis of

the formula detailed in Modification P00010, the Air Force assessed $115,593.66 in liquidated damages, reducing the contract price from $2,367,717.13 to $2,252,123.47. The Air Force deferred assessment of liquidated damages for Blocks Two through Ten until the renovation was complete.

On or about August 1, 1985, plaintiff completed its renovations of the Phase III units. By letter of September 5, 1985, Contracting Officer Gabrielson invited plaintiff to present facts—not the result of its own fault or negligence—that justified the delays in the renovations:

> The possible assessment of $291,935.76 could very well have a direct impact on your children and you[r] grandchildren's inheritance. Suggest you take this opportunity to present any reasons for your delays which were beyond your control. Be specific! Upon receipt and review, the assessment of liquidated damages for Blocks 2 thru 10 will be made.

Apparently, any reasons advanced by plaintiff were, in the view of the Air Force, insubstantial. The largest time extension granted by the Air Force for any of these later blocks was five days.

Per Modification P00032, dated July 1, 1986, $260,239.27 in additional liquidated damages were assessed, reducing the contract price from $2,113,115.64 to $1,852,746.21. However, since there were periods of time wherein plaintiff was delayed in renovating more than one block of units, assessment of contract administration costs on a per-block basis would have amounted to a penalty, since the Air Force incurred identical contract administration costs if one block or all ten blocks were behind schedule. Assessment of administration costs on a per-block basis was thus an infirmity in the P00010 formula of assessing liquidated damages that only came to light as plaintiff fell further behind on its performance schedule. When the Air Force assessed liquidated damages for delays in Blocks Two through Ten, the liqui-

dated damages formula had to be adjusted yet again. Modification P00032 reads:

> Pursuant to General Provision 71, Liquidated Damages, as modified in P00010, liquidated damages are hereby assessed in the amount of $12.28 per day for the loss of BAQ for each family housing unit, and $211.66 per day for each day beyond the specified performance period for block of houses. Whenever there is any portion of two blocks late, simultaneously, the block rate is only assessed against one block, thus the indicated period of time charged for the block rate will not necessarily correspond with the dates indicated for the BAQ assessment....

Plaintiff now seeks remission of all liquidated damages assessed by the Air Force.

As a result of the significant deductions to the contract price, the Contracting Officer determined that plaintiff had been overpaid by $150,602.15. Mrs. Gabrielson, by a letter dated March 12, 1987, detailed the Air Force's calculations and requested the return of that sum within 30 days. When the monies were not forthcoming, Mrs. Gabrielson made her "Final Decision" that an overpayment had been made on April 22, 1987. Plaintiff continues to contest that any overpayment was made or is due the Air Force.

A total of $513,532.32 in deductions was made on plaintiff's contract: $137,699.39 in deductions related to the salt-treated pine, and $375,832.93, to liquidated damages— $150,602.11 of that amount representing the claimed overpayment.

On January 29, 1989, plaintiff submitted a certified claim for an equitable adjustment to the contract price for $501,014.70. Plaintiff's claim was denied by the Contracting Officer on July 3, 1989, and it commenced suit in this court on April 22, 1988.[3]

## DISCUSSION

### I. Summary judgment standards

Summary judgment is appropriate when there are no genuine issues of mate-

---

**3.** Contending that plaintiff failed to certify two claims, defendant moved with respect to plaintiff's claims regarding failure to review properly shop drawings (Amended Compl. ¶ 30(d)) and

delay in processing progress payments (Amended Compl. ¶ 30(e)). Plaintiff does not contest defendant's motion on point, and these claims are dismissed on jurisdictional grounds.

rial fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Only genuine disputes over material facts, or facts that might affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. 477 U.S. at 248, 106 S.Ct. at 2510. Both plaintiff and defendant, as the moving parties, have the burden of establishing that there are no genuine material factual issues in dispute and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In the capacity of opposing each other's motion, plaintiff and defendant have the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex,* 477 U.S. at 322, 324, 106 S.Ct. at 2552, 2553.

> To create a genuine issue of fact, the non-movant must do more than present *some* evidence on an issue it asserts is disputed. The Court stated:
>
>> [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence [of the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted....

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir. 1988) (emphasis in original) (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted), and citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

■ In resolving the cross-motions, the court cannot weigh the evidence on summary judgment and determine the truth of the matter. *Anderson,* 477 U.S. at 249, 255, 106 S.Ct. at 2510, 2513. Any evidence presented by the opponent is to be believed, and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. Uncontested material facts also have been found consistent with the rule that, in respect of any facts that may be considered as contested, each party, in its capacity as the opponent of summary judgment, is entitled to the benefit of "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ Summary judgment pursuant to RUSCC 56 properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action....'" *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1) (quoted in *Avia Group Int'l,* 853 F.2d at 1560, and *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987)).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555; *see also Universal Life Church, Inc. v. United States,* 13 Cl.Ct. 567, 580 (1987) (citing cases), *aff'd,* 862 F.2d 321 (Fed.Cir. 1988) (Table). A trial court may deny summary judgment, however, if "there is reason to believe that the better course would

be to proceed to a full trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. (citation omitted).

II. Defendant's motion for summary judgment

Defendant moved for summary judgment on five grounds that are distinct from other grounds in plaintiff's cross-motion for partial summary judgment. Defendant asserts that rejection of plaintiff's first five cabinet submittals was appropriate and that freeze-related damage to the cabinets was the contractor's responsibility, that the Air Force was not responsible for shortages of conforming vanity tops, that the direction to replace nonconforming HVAC with conforming equipment was proper, and that the Air Force's estimates as to the amount of wall preparation were reasonable.

1. *Kitchen cabinet claim*

Plaintiff complains that the unwillingness of Air Force inspectors to approve particle board cabinets as "equal" to the hardwood cabinets was unreasonable and contravened the Government's duty to cooperate with their contractors. Plaintiff relies on the statements of Messrs. Rumbaugh and McFaul that particle board cabinets are considered equal to hardwood cabinets in the home construction industry and the apparent willingness of Base Housing Chief Dietz to accept particle board cabinets. Plaintiff asks this court to deny defendant's motion for summary judgment and afford it an opportunity to present its claim on damages.

■ As a purchaser of supplies and services, the Government is entitled to the contractor's strict compliance with the contract specifications. *Peters v. United States,* 694 F.2d 687 (Fed.Cir.1982). Also true, however, is that government officials are obligated to interpret contract specifications reasonably when determining what supplies or services conform to the contract requirements. *W.G. Cornell Co. v. United States,* 179 Ct.Cl. 651, 672–73, 376 F.2d 299, 313 (1967) (citing cases). A contractor is entitled to recover damages in cases where the Government has been arbitrary or capricious in interpreting contract requirements. *Id.*

■ If the contracts are sufficiently similar, prior contracts between the parties provide valuable insight and evidence as to contract requirements. *See Cresswell v. United States,* 146 Ct.Cl. 119, 127, 173 F.Supp. 805, 811–12 (1959) (plaintiff's performance of an earlier and identical contract according to defendant's construction of the contract terms was strong evidence of the parties' interpretation of disputed terms); *cf. Jansen v. United States,* 170 Ct.Cl. 346, 354–55, 344 F.2d 363, 369 (1965) ("[C]lear departures from the provisions of earlier contracts," such that changes in the specifications were "clear and significant," made reference to understandings under prior contracts inappropriate); *L.B. Samford, Inc.,* DOT CAB No. 1457, 85–2 B.C.A. (CCH) ¶ 18,081, 1985 WL 16593 (1985) (reference to prior contractual dealings inappropriate where comparison of contract provisions and documents was impossible and where requirements of earlier contract differed from the one in dispute). Arguing that the conduct of Air Force inspectors in rejecting the particle board cabinet departed from prior practice and therefore was arbitrary and capricious, plaintiff cites *J.B. Williams Co. v. United States,* 196 Ct.Cl. 491, 450 F.2d 1379 (1971), and *John R. Hollingsworth Co.,* DOT CAB No. 69–15, 71–1 B.C.A. (CCH) ¶ 8,760, 1971 WL 987 (1971).

■ In *J.B. Williams Co.,* the General Services Administration issued an invitation for bids for the production of radiological survey meters. Due to the tight production schedule, the contractor requested, as permitted in the solicitation, that the Government provide it with samples of survey meters which conformed to the specifications. The Government sold ten survey meters to the contractor that had been supplied by the previous manufacturer. While the contractor replicated the sample that was furnished, neither the contractor's model nor the sample provided was able to pass government-sponsored tests. The contractor incurred costs in redesigning its

meters so as to comply with the specifications as written. Since the contract in *J.B. Williams Co.* included a clause whereby conflicts between the specifications and the furnished sample were to be resolved in favor of the specifications, both the contracting officer and the General Services Board of Contract Appeals denied the contractor's claim for an equitable adjustment. Reversing, the Court of Claims held that the contractor's interpretation that the contract called for reproduction of the furnished sample was reasonable and that the contractor was entitled to recover the added costs.

Defendant argues that a result similar to that of *J.B. Williams Co.* would be inappropriate upon these facts, because the Air Force did not furnish a kitchen cabinet sample to plaintiff. The case should not be read so narrowly. The Government is under a duty to deal fairly with its contractors whether or not a sample is furnished. The sample in *J.B. Williams Co.* is significant only because it amounted to a government representation that the product furnished to the contractor complied with the contract specification—a representation upon which the contractor was entitled to rely. As the court ruled:

> [T]here was never as much as a hint that the ... [sample] did not measure up to Government standards. What we are holding, in effect, is that the Government cannot always absolve itself of all responsibility, particularly when making certain representations (either express or implied), by merely inserting a clause into a contract to that effect.

196 Ct.Cl. at 510–11, 450 F.2d at 1390. The rule is appropriate for application in this case only if the Air Force designated particle board cabinets equal to hardwood cabinets in Phase II and plaintiff relied to its detriment upon that designation when bidding on Phase III work.

Similarly, in *John R. Hollingsworth Co.*, the critical feature was not the number of prior dealings with the Government—defense counsel asserted at argument that no fewer than two prior dealings with the Government were required before a con-

tractor could rely on official conduct—but, rather, the nature and quality of the relationship with government officials. In *John R. Hollingsworth Co.* the contracting officer refused to permit the contractor to furnish "interim" instruction manuals with the substations it was manufacturing and required the contractor to complete and tender the final instruction book before any substations would be accepted. The Department of Transportation Contract Appeals Board found that the conditions placed on acceptance by the contracting officer caused a change in the contractor's method of performance, departed from prior dealings with the contractor, departed from agency practice, were at odds with contract clauses that suggested a deduction was a more appropriate remedy, and were inconsistent with a six-week agency review of the interim manual. 71–1 BCA ¶ 8,760, at 40,663. The principle to be gleaned from both *J.B. Williams Co.* and *John R. Hollingsworth Co.*, is that contracting officials are not permitted to hold fast to the language of the contract when their own conduct has been at odds with the interpretation urged and the contractor relied to its detriment on the earlier conduct.

■ It is uncontroverted that plaintiff was permitted to deviate from the cabinet specifications during Phase II of the renovations. In preparing a bid for Phase III work, however, plaintiff could not rely on continued government largesse in accepting deviations. The Air Force was entitled to strict compliance with the specifications and was under no duty to accept nonconforming submissions. *See H.L.C. & Assocs. Constr. Co. v. United States*, 176 Ct.Cl. 285, 306, 367 F.2d 586, 598 (1966) (Government entitled to insist on use of specified materials, regardless of its reasons); *Farwell Co. v. United States*, 137 Ct.Cl. 832, 836, 148 F.Supp. 947, 949 (1957) (Government had right to expect that the materials specified in the contract would be used). Nonetheless, plaintiff, through its expert Mr. Rumbaugh, has created a disputed issue of material fact as to whether the Boro cabinets submitted were "equal" to the specifications. Therefore, two dif-

ferent scenarios are posed: If the cabinets submitted by plaintiff in Phase III were nonconforming, the Air Force was under no obligation to accept them; on the other hand, if the submitted cabinets were equal to those detailed in the specifications and the Air Force interpreted its own specifications too rigidly, the contractor is entitled to recover. The court is unable to resolve such a question without the aid of expert testimony and accordingly must defer decision on this matter until after trial.

■ Whatever the result on this question, the court does not agree that the Air Force failed properly to verify plaintiff's bid. Relying on *BCM Corp. v. United States*, 2 Cl.Ct. 602 (1983), plaintiff asserted at argument that Air Force officials were no doubt aware that plaintiff would propose to use particle board cabinets in Phase III, since the deviation from the specifications during Phase II work had been permitted. In *BCM* the firm LD/S, which was subsequently declared nonresponsive, read the contract as omitting a significant portion of the contract work and submitted a bid on that basis. This court held that having been apprised of the disqualifying mistake made by LD/S, the contracting officer was "aware of facts and circumstances which reasonably should have given rise to the presumption of error in the bid under consideration" from BCM. 2 Cl.Ct. at 609. Aware of facts that gave rise to the presumption of error, the contracting officer had a duty to verify the bid, "calling attention to the specific error suspected, whether or not that error is reasonable." *Id.* (citing *Ruggiero v. United States*, 190 Ct.Cl. 327, 420 F.2d 709 (1970)).

*BCM* is inapposite to this case, and application of the rule of *BCM* would be inappropriate upon these facts. When a mistake is suspected, the contracting officer must seek verification of a contractor's bid; yet, government officials are not required

to speculate as to the bases of the contractor's bid. 2 Cl.Ct. at 612. A contrary rule would establish more than the good faith of the Government—it would make the United States an insurer of its contractor's mistakes. The procedure urged by plaintiff would have required the Air Force to speculate as to the basis of plaintiff's bid: As a result of the deviation permitted in Phase II, plaintiff reasons that it was foreseeable that plaintiff would choose Boro again, out of all the suppliers of kitchen cabinets, for Phase III renovations. Such an argument would compel the Air Force to guess the identity of plaintiff's suppliers and is a result squarely at odds with *BCM*.[4]

### 2. *Freeze delay claim*

■ Plaintiff complains that it suffered both increased costs and delays as a result of the freeze-related damage to units during December 1983. It asserts that not only were temperatures lower than those forecast, but had it been able to supply particle board cabinets instead of hardwood cabinets, water damage from freeze-damaged pipes would have been less severe. Defendant responds that plaintiff failed in its obligation adequately to heat the units in its possession, that 47 percent of the units in plaintiff's control suffered freeze-related damage, and that the offending cold front had been forecast and publicized in the local newspaper.

The applicable contract provision, DAR § 7–602.5(d)(1) exonerates a contractor for delay due to "unusually severe weather." In opposing defendant's motion for summary judgment, plaintiff is entitled to all inferences and intendments that can be made from evidence in the record. The newspaper weather forecasts offered by defendant cannot establish that the weather in late December of that year was not "unusually severe". However, the climatological data submitted by Master Sergeant Stevens does address the severity of the weather.

---

4. In *BCM* the Government's estimate substantially exceeded the contractor's, as in this case: Plaintiff bid $2,359,000.00, against an Air Force estimate of $3,874,049.00. However, the contract in *BCM* was unitary, whereas this contract included many different bid items and plaintiff did not break down its bid. Out of a $2.3 million contract, plaintiff at argument estimated that the cabinets represented $200,000.00. Therefore, the disparity between the Air Force's and plaintiff's estimates provides no basis for drawing inferences against the Air Force.

According to the "Daily Climatological Data" accompanying the Master Sergeant's affidavit, the minimum temperature recorded on December 26th was six degrees fahrenheit. Six degrees fahrenheit was 22.6 degrees lower than the mean minimum temperature that December. The lowest temperature that month, three degrees, was recorded on the day preceding the pipe burst, December 25th. While sponsored by defendant, the facts accompanying the affidavit create a disputed issue of material fact as to whether the weather was "unusually severe." Under these circumstances, decision on plaintiff's entitlement to an equitable adjustment and time extension as a result of the severe weather is reserved until after trial.

### 3. Vanity top claim

■■■■ Plaintiff argues that the failure of the Air Force promptly to approve conforming cabinet submissions resulted in delays in obtaining kitchen vanity tops. According to plaintiff, had the Air Force approved the kitchen cabinets submitted, plaintiff would have avoided the shortages of plastic laminate in November 1984. Plaintiff also charges that it had a shortage in funds necessary to purchase the tops due to the Air Force's taking a wrongful credit for fencing material.

The availability of necessary materials and components are part of the normal business risks assigned to the contractor. *See Jennie–O Foods, Inc. v. United States,* 217 Ct.Cl. 314, 328, 580 F.2d 400, 409 (1978) (where supplies were obtainable from other sources, contractor's failure to meet its contractual obligations was inexcusable). Moreover, the damage suffered by plaintiff, even if proved, is too remote from the duty to interpret specifications fairly and rationally. In *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353 (1951), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952), the Court of Claims denied recovery for lost profits, interest on loans, and costs of bankruptcy that the contractor attributed to the Army's failure to make prompt contract payments. As to the contractor's costs in bankruptcy, the court held:

That the nonpayment of the contract price of the two contracts would put the corporation on the brink of bankruptcy could not have been reasonably foreseen by the Government.... The nonpayment by the Government of the contract price does not naturally and inevitably produce bankruptcy. Even if the Government had paid the corporation promptly, there is no assurance that the funds would have diverted financial difficulties. Accordingly, we conclude that plaintiffs' claim for reorganization expenses should not be allowed.

121 Ct.Cl. at 433, 101 F.Supp. at 357; *see also Myerle v. United States,* 33 Ct.Cl. 1, 27 (1897) ("For a damage to be direct there must appear no intervening incident ... the cause must produce the effect inevitably and naturally, not possibly nor even probably...."). The damage suffered as to plastic laminate vanity tops, as a result of Air Force ratings on the kitchen cabinet submissions or withholding monies due to the credit for fencing, is speculative and consequential. Recovery is not permitted as a matter of law.

### 4. HVAC installation claim

■■■■ Plaintiff's makes two arguments regarding the installation of nonconforming HVAC equipment. First, plaintiff asserts that Air Force inspector W.L. Campbell inspected the submitted equipment, found it to be acceptable, and signified his approval by making appropriate notations on the equipment cartons. Second, plaintiff argues that after the nonconforming equipment was installed, the Air Force's requiring that the nonconforming systems be removed and replaced by conforming equipment amounted to economic waste. Plaintiff contends that "the deviation in air flow between the equipment required by the Contract requirements and the incorrectly installed equipment was minor...." Plf's Br. filed Mar. 9, 1990, at 39. It references Contracting Officer Gabrielson's letter of October 3, 1983. Mrs. Gabrielson therein states that the air flow from the units, in cubic feet per minute, is "up to 8.5% lower than required."

Plaintiff's resistance to defendant's motion for summary judgment on this ground is insufficient. There is no basis in the documents provided for making the assertion that 8.5 percent less air flow than required is a minor deviation. To avoid summary judgment, the non-movant is charged with setting forth specific facts that generate an issue of material fact. The non-movant's burden is not discharged by reliance on conclusory allegations. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. Plaintiff has not set forth sufficient countervailing facts, or "any significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). Since defendant relies on the admission of Mr. Troise, Jr., that the nonconforming units were the fault of plaintiff and plaintiff has adduced no contrary evidence that would raise a genuine issue of material fact, defendant's motion is granted on this claim.

5. *Wall refinishing claim*

Plaintiff asserts that the Air Force's estimate of the amount of wall preparation required was grossly inadequate and seeks an equitable adjustment in the price and performance time under the contract. Defendant argues that plaintiff has not demonstrated that the amount of wall repairs exceeded the estimated quantity by more than a reasonable amount or that the claimed amount of excess wall repair was not responsible for any claimed delay.

▪ An estimate is used to guide a bidder on a particular point when the specific information needed is not reasonably available for verification. *Timber Investors, Inc. v. United States*, 218 Ct.Cl. 408, 417, 587 F.2d 472, 477 (1978); *see H.L. Yoh Co. v. United States*, 153 Ct.Cl. 104, 106–07, 288 F.2d 493, 494–95 (1961). In making its estimate, "the Government is not required to be clairvoyant, but it is obliged to base that estimate on all relevant information that is reasonably available to it." *Womack v. United States*, 182 Ct.Cl. 399, 412–13, 389 F.2d 793, 801 (1968). Assuming that he acts reasonably, the bidder is entitled to rely on government estimates as representing honest and informed conclusions. *Id.; see Snyder–Lynch Motors, Inc. v. United States*, 154 Ct.Cl. 476, 479–80, 292 F.2d 907, 909–10 (1961) (plaintiff entitled to damages as compensation for reliance on government estimates which government officials knew or should have known were inaccurate).

▪ In *Womack* the number of index cards the contractor was required to utilize was estimated at 65,000, although the actual quantity was 105,000. The Court of Claims ruled that there was substantial information available to the Bureau of Land Management that, if investigated, would have alerted it of a mistake in the estimate of the index cards. The court stressed that the agency should have investigated all the information reasonably available to it before formulating its prospectus bid estimate. An exercise in reasonable care would have alerted defendant "to the substantial incorrectness of its unquestionably honest but equally erroneous impression" concerning the matter. 182 Ct.Cl. at 410, 389 F.2d at 799.

As did the contractor in *Womack*, plaintiff in the instant case relied on the estimate in the contract which indicated that 2,035 linear feet of cracks needed repair. In actuality the wall surface preparation amounted to 3,764 linear feet, an 85–percent increase, according to Contracting Officer Gabrielson. The determination of the following issues, however, must be ascertained before establishing whether the Air Force's estimate represented an honest and informed conclusion under *Womack:* 1) whether the Air Force was aware of the discrepancy between the estimate and the actual wall surface preparation needing repair and 2) whether the Air Force thoroughly and competently investigated the wall surfaces before formulating its estimate. If it is found that the Air Force made a thorough investigation of the wall surfaces, for example, by either hiring a specialist in the field or by measuring the cracks in the majority of the AFB houses, then the Air Force will have established

that it utilized all the information available to it and thus made an honest and informed conclusion.

> [M]aterial representations in the government's plans and specifications upon which the contractor justifiably relies, in the absence of a caveat regarding verification of the facts represented, amount to a warranty, and the contractor is entitled to recover damages caused by the incorrectness of such representations, irrespective of the good faith with which they were made....

*Everett Plywood & Door Corp. v. United States*, 190 Ct.Cl. 80, 92, 419 F.2d 425, 431 (1969). "In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself...." *Dale Constr. Co. v. United States*, 168 Ct.Cl. 692, 699 (1964); (quoted in *Caffall Bros. Forest Prods. v. United States*, 230 Ct.Cl. 517, 526, 678 F.2d 1071, 1076, *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982)).

In *Caffall Bros.* plaintiff and the Forest Service entered into a contract whereby plaintiff would cut and remove an estimated volume of 13,300 thousand board feet ("mbf") of timber marked or designated for cutting. The volume of linear actually cut, however, was 3,514 mbf less than the estimated volume. The contract provided that the estimated quantities were not to be construed as guarantees or limitations of the timber volumes to be designated for cutting under the terms of the contract. The prospectus explicitly advised prospective bidders that the estimated timber volumes were not estimates of a purchaser's own recovery and that the bidder should therefore examine the timber sale areas and make its own recovery estimates. In addition, the contractor, in compliance with the contract, sent the head of its forestry department to examine the areas and he concluded that the cruise information of the sale prospectus appeared reasonable. Therefore, the contractor was not only told to rely upon its own investigation, but, in fact, did rely in substantial part upon its own examination of the area.

In the instant case the contract provided: " 'Dimensions and quantities shown ... are shown nominal for the purpose of estimating only. Exact dimensions and quantities must be ascertained by the Contractor for the purpose of new equipment, supplies, and materials....' " The purpose of the provision is unclear, for it could be held that it contained cautionary language as to the effect that a prospective purchaser should not rely on the Air Force's estimate until ascertaining the dimensions and quantities itself. *See Everett Plywood*, 190 Ct.Cl. at 92, 419 F.2d at 431. However, an alternative interpretation of the provision is that its purpose was to ensure that the contractor was prepared with the proper equipment and supplies to complete the job, rather than for the purpose of estimate verification.

The Court of Claims in *Everett Plywood* held that a warranty was extended to the contractor because, among a number of other factors, the contract contained no disclaimer pertaining to the estimate. The court also noted that the underlying factor that the contractor had no reasonable opportunity to conduct a tour through the subject tracts to verify the estimate had an effect on the outcome of the case. Therefore, another important issue in the case at bar is whether plaintiff had an opportunity to conduct an investigation of the AFB houses. If there was such an opportunity and plaintiff failed to utilize it, this factor may be persuasive under *Everett Plywood*.

If the Government incorporates an unequivocal disclaimer in the contract or if the purchaser warrants that it relies on its own information for bidding purposes, the warranty of reasonable accuracy will be a nullity. *Webco Lumber, Inc. v. United States*, 230 Ct.Cl. 457, 462–63, 677 F.2d 860, 863 (1982). For example, the contract in *Ralph Construction, Inc. v. United States*, 4 Cl.Ct. 727, 729 (1984), to perform routine maintenance services for government housing facilities included a provision that stated "in the event the Government's requirements for supplies or services set

forth in the Schedule do not result in orders in the amounts or quantities described as 'estimated' or 'maximum' in the Schedule, such event shall not constitute the basis for an equitable price adjustment under this contract." However, even a clear and unequivocal disclaimer may not insulate the Government from an action for breach of contract if the estimate is grossly erroneous or negligently prepared which indicates a failure to exercise reasonable care and diligence in arriving at said estimates. *Timber Investors*, 218 Ct.Cl. at 415 n. 4, 587 F.2d at 475–76 n. 4. If the disclaimer is not sufficiently clear and unequivocal, there may be special facts which should alert the bidder to be wary in its reliance on the estimates set forth in the contract and such facts may nullify the warranty of reasonable accuracy. *Clearwater Forest Indus., Inc. v. United States*, 227 Ct.Cl. 386, 394–95, 650 F.2d 233, 238–39 (1981). In *Timber Investors* the Court of Claims stated that since the determination of whether work and cost estimates involved in the Forest Service's timber sale contract and its associated purchaser road construction credit provisions is primarily a factual inquiry, a contractor challenging the accuracy of the estimates has the burden of proving that the estimates were, in fact, grossly or unreasonably inaccurate. The contractor's claimed costs exceeding the estimates could not be verified from any of the subcontractor's audit books or records; rather, the costs reflected computations, opinions, and assumptions. Unlike *Timber Investors*, where plaintiff failed to prove the costs above the estimate, both parties agree that plaintiff was required to repair 85 percent more cracks than indicated by the schedule. Whether or not an 85–percent underestimate in a contract is grossly inaccurate is an essential issue in this case. It would appear that such an extreme deviation from the original estimate would be held to be grossly inaccurate and negligently prepared.

In this case, as noted earlier, the contract contains a provision disclaiming the accuracy of estimates and charging the contractor to verify them. The court may rule that, similar to *Ralph Construction* and *Dale Construction*, this clause warns the contractor that it is not entitled to rely solely upon the estimate, but, rather, that it must ascertain the amount of wall surface needing repair itself. In these circumstances and absent bad faith on the part of the Air Force, there would be no ground for relief. Alternatively, it could also be found, more logically so, that the purpose of the provision was to ensure that the contractor had the proper equipment necessary to complete the job, as opposed to alerting the contractor that the estimate may be erroneous.

### III. Plaintiff's cross-motion for summary judgment

Plaintiff cross-moves for summary judgment on two grounds. Plaintiff asserts that both the deductive credit for the fencing lumber change and the amounts assessed in liquidated damages should be remitted.

#### 1. *Deductive credit for lumber*

On March 19, 1984, the Air Force issued Modification P00021. The modification deducted $137,699.39 from the contract price and credited government accounts for changes in the privacy fencing specification.

Two facts are critical to plaintiff's argument on voiding the deductive credit. First, during Phase II renovations, plaintiff was permitted to substitute "fence grade cedar" for "C select cedar". Plaintiff states that "C select cedar" was both commercially unavailable and inappropriate for use as fencing. Second, Phase III fencing specifications included "Eastern Spruce No. 1 Dim." No. 1 Dim. refers to dimensional lumber in sizes of 2 inches and larger, which could not have been used in making 1 inch by 6 foot fencing slats. According to Mr. Troise, Jr., cedar still was unavailable during Phase III. Troise Aff. ¶ 8. Plaintiff argues that when it was confronted with the latent ambiguity in the specifications, it looked to the prior course of dealing between the parties to resolve the ambiguity. On these grounds plaintiff asserts that it was reasonable for it to submit

a bid based upon fence grade spruce instead of the improvidently high grade selection of Eastern Spruce No. 1 Dim. Moreover, plaintiff contends that defendant has "offered no credible evidence to support its calculation...." Plf's Br. filed May 15, 1990, at 5–6. On the grounds that defendant has "failed to justify the issuance of the deductive credit in light of the Specification's admitted defects and other mixed signals the Government gave to EJT," *id.*, plaintiff asks that this court rescind Modification P00011.

Defendant counters by stating that plaintiff was obligated to submit a bid on the basis of the specification as written and that the Air Force was entitled to receive either the materials "originally specified or the full credit due to the amended specification." Def's Br. filed Jan. 29, 1990, at 32. To rescind the deduction, defendant argues, would "reward [plaintiff] for willfully ignoring the Government's original Phase III specification and underbidding the competition...." *Id.* at 33.

Two issues are presented: defendant's entitlement to the credit and quantum. Defendant would not be entitled to the downward adjustment if the fencing specification was latently defective and plaintiff's interpretation of the specification was reasonable. *See John C. Grimberg Co. v. United States*, 7 Cl.Ct. 452, 456, *aff'd*, 785 F.2d 325 (Fed.Cir.1985) (Table). If the defect in the specification was patent or plaintiff's interpretation of the specification was unreasonable, the court must then decide whether plaintiff has established a genuine issue of material fact as to defendant's calculation of the credit. The issue of the amount of credit due the Air Force centers on its reasonableness.

### a. Patency of defect

Relying upon the fact that plaintiff did not call the alleged defect to the Air Force's attention until after plaintiff bid on the contract, defendant invokes the doctrine of patent ambiguity. Defendant argues that plaintiff should be held responsible for costs that could have been avoided had plaintiff inquired as to defects in the solicitation materials. Defendant

states: "It is obvious that EJT knew at the time it submitted its bid on Phase III that the lumber specification would be expensive to meet, yet it remained silent until after it had been awarded the contract...." Def's Br. filed Jan. 29, 1990, at 33. A patent ambiguity must be " 'so glaring as to raise a duty to inquire.' " *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed.Cir.1988) (quoting *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir.1987) (emphasis in original)). If the ambiguity is patent then a duty arises on the nondrafting party to inquire as to its meaning. *J.B. Steel, Inc. v. United States*, 810 F.2d 1139, 1141 (Fed. Cir.1987) (contractor has duty to scrutinize drawings and specifications for potential problems prior to bidding). The contractor must inquire as to only major discrepancies, obvious omissions, or drastic conflicts in contract provisions. *WPC Enterprises v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963). It is the obviousness of the discrepancy that imposes the duty upon the contractor, not the actual knowledge of the contractor. *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 515, 455 F.2d 1037, 1045 (1972). The failure to recognize an obvious ambiguity does not excuse the contractor from his affirmative duty of inquiry. *See, e.g., J.A. Jones Constr. Co. v. United States*, 184 Ct.Cl. 1, 395 F.2d 783 (1968). In order to avoid expensive and complex litigation, courts place the duty to inquire upon the contractor. *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963); *see J.B. Steel*, 810 F.2d at 1141.

Plaintiff acknowledges in brief that "Eastern Spruce No. 1 Dim. could not have been used on the one inch by six foot fencing slats," Plf's Br. filed Mar. 9, 1990, at 22 n. 9 (citation omitted), and Mr. Troise, Jr.'s affidavit is silent as to how he regarded the specification. *See* Troise Aff. ¶¶ 8–9. Plaintiff clearly recognized the problem with the Eastern Spruce No. 1 Dim. and addressed it, not by alerting the Air Force, but by disregarding it. This plaintiff was not entitled to do consistent with a contractor's obligation when confronted with a glaring defect. To the ex-

tent that plaintiff relies on its prior experience with Phase II fencing, the unavailability of the fencing material called for was resolved in consultation with the Air Force, not by plaintiff's unilateral resolution. The calculation of any credit due the Air Force therefore must be based on the lowest plaintiff could have bid on cedar, assuming that it was available.

### b. Calculation of credit

■ Plaintiff has shown that the reasonableness of defendant's calculation of the credit is a disputed issue of material fact. Plaintiff relies on a number of Air Force documents in support of its contention that a credit of $137,699.39 was unreasonable. An Air Force estimate dated September 7, 1981, put the total price for all privacy fencing at $91,020.00. The Construction Cost Estimate Breakdown completed by the Engineering and Environmental Planning Branch in June 1983 states that an appropriate credit would be $94,243.00. Indeed, Contracting Officer Gabrielson's own memoranda call into question the propriety of the deducted amount. Only one out of the six lumber firms solicited responded to the Air Force's queries as to lumber prices. The one firm that did respond was not in the Dover area, but in Portland, Oregon. Lastly, the Air Force relied on the statement of "Mrs. Nydam" of "Quabaug Lumber Distributors" that the applicable inflation rate in the lumber market, since the time of plaintiff's bid, was 18.7 percent. Nothing in the record details either Mrs. Nydam's qualifications or the basis for such an opinion. The reasonableness and accuracy of the Air Force's deduction is an issue for trial.

Finally, it should be pointed out that this issue devolves to tautology: Plaintiff cannot base the credit on its bid, as a consequence of having arrogated to itself the right to bid a grade of fencing material not specified; yet, the Air Force cannot premise a credit on lumber that was not available to the bidders. This claim cries for settlement.

### 2. *Liquidated damages claim*

■ Liquidated damage provisions should be enforced if 1) at the time of contract award the nature and amount of actual damages are uncertain, and 2) the specified damage amount is a reasonable estimate of the Government's anticipated loss. *Jennie–O Foods, Inc.*, 217 Ct.Cl. at 336–38, 580 F.2d at 413–14. Since liquidated damages provisions amount to a prediction of future damages, they will only be enforced when they represent fair and reasonable attempts to fix just compensation for anticipated loss by breach of contract. As *Restatement (Second) of Contracts* restates:

> (1) Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulty of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

*Restatement (Second) of Contracts* § 356 (1981). The focus is on the parties' effort to fix compensation. As liquidated damages clauses are often used to fix uncertain damages in advance of the breach, the reasonableness test is applied as of the time of contract formation. *Priebe & Sons v. United States*, 332 U.S. 407, 411–12, 68 S.Ct. 123, 125–26, 92 L.Ed. 32 (1947).

Plaintiff argues that the liquidated damages clause is an "abuse of power," Plf's Br. filed May 15, 1990, at 7, punitive, and unenforceable. Viewed from the perspective of the time the parties entered into the contract, plaintiff asserts that the rates are not a reasonable prediction of delay damages and operate as a penalty. Plaintiff asks this court to set aside the assessment of liquidated damages and direct the Air Force to remit the sums wrongfully withheld.

Plaintiff further contends that the unreasonableness of the liquidated damage provision is revealed by the fact that the clause required substantial modification during performance. It relies on an April 14, 1983 memorandum by Mrs. Gabrielson in asserting that the provision was untenable at the time of contract formation and that this

fact was later recognized by the Air Force. Mrs. Gabrielson wrote:

1. The Contractor is presently behind schedule and may continue for some time yet to come. In reviewing the LD clause and computing the amount charged based on a thirty day delay, the Contractor would be assessed $134,364.00 ($223.94 × 20 units × 30 days). If taken to court, the Government could not substantiate a cost breakdown. The daily amount of $4,478.80 would be deemed punitive.

While an admission, the memorandum also details the Air Force's efforts at correcting the proposed assessment:

2. Although the dollar figure of $223.94 is a good justifiable figure, it was formulated incorrectly. The full rate should not have been placed on a "per unit, per day" basis; only the BAQ [Beneficial Allowance for Quarters] rate was to be assessed on a "per unit" basis.

3. The mod reflects a unit rate of $12.28 per day added to the block rate of $211.66 per day for a total of $457.26 per day ($12.28 BAQ rate × 20 units = $254.60 + $211.66 cost of additional supervision and inspection = $457.26). This is a fair amount, applied correctly and it is justifiable.

The significant difference between the calculations is that under the unmodified clause, the entire rate was multiplied by each unit delayed. Under Modification P00010 only the BAQ rate would be applied to each unit.

Plaintiff asserts that it signed under duress Modification P00010, which modified the assessment of administrative costs from a per-block to a per-day basis. As plaintiff states in brief, "the fact that EJT now faced the potential assessment of liquidated damages eliminated any bargaining power EJT may have had...." Plf's Br. filed May 15, 1990, at 10. To plaintiff, the specter of a $134,000 assessment for 30 days' delay loomed large: "Realistically, what contractor, facing this type of assessment, would refuse to agree to a liquidated damages modification that appeared to reduce liquidated damages from a maximum

assessment of ... $4,478.80 ... per day to ... $457.26 ... per block per day[?]" *Id.* at 9. Even under a formula where the administrative costs were charged on a per-day basis, regardless of the number of blocks delayed, the Air Force accrued significant sums in liquidated damages. Through Modification P00032, which applied the new formula to Blocks Two through Ten, the Air Force deducted $260,239.27 from the contract price.

Lastly, plaintiff argues that the assessment of any liquidated damages was improper until the 450-day period for contract performance had lapsed. Plaintiff asserts that the Air Force was obligated to incur contract administrative costs during the 450-day period and therefore did not suffer any damage as result of the delays in returning units before the scheduled end of performance. As plaintiff recounts:

[A]s of April 5, 1983, the day liquidated damages were first assessed, the Government has failed to provide any evidence or reason why it suffered increased administrative costs. Additionally, the fact that EJT was late during the four hundred fifty (450) day Contract period never created a situation where additional administrative costs were incurred. For example, at no time did EJT have more than two (2) blocks in its possession, exactly the position which was anticipated at Contract execution.

Plf's Br. filed May 15, 1990, at 12.

Defendant replies that the liquidated damages provision was reasonably drafted and fairly applied whenever plaintiff was delayed. Moreover, defendant argues that no evidence has been adduced of plaintiff's duress in signing Modification P00010 and that the contract contemplated plaintiff's performance, not over the entire 450-day period, but in accordance with the more rigorous "Progress Schedule."

From the viewpoint of the parties at the time of contract formation, the liquidated damage provision in plaintiff's contract was reasonable. All of the contemporaneous documents indicate a serious and good-faith effort on the part of the Air Force to detail the uncertain damages it

would suffer if the renovated units were not returned to it in a timely fashion. The best description of events is that neither of the parties—at the time of contract formation—predicted that plaintiff would be so long delayed during performance. As plaintiff fell further behind schedule, the liquidated damages formula that would have been appropriate had a handful of units been delayed was reworked by contracting officials in an effort to manage a contract where whole blocks of units were unrenovated. Lastly, it is significant that plaintiff was never assessed administrative costs on a per-block basis when more than one block remained unrenovated. Since the Air Force deferred assessment of liquidated damages for Blocks Two through Ten until the end of contract performance, the only assessment that had occurred was for delays in a single block, Block One. Assessment of administrative costs on a per-block basis was not redundant when only one block was delayed. Nor were the administrative cost rates applied on a per-block basis in Modification P00032, when multiple blocks had been delayed. Under these circumstances the court holds that the original prediction of damage was reasonable and was not intended to operate as a penalty.

In support of this conclusion, the court is guided by *Wise v. United States,* 249 U.S. 361, 39 S.Ct. 303, 63 L.Ed. 647 (1919). The Court held that liquidated damages provisions are to be enforced

> where the damages are uncertain in nature or amount or are difficult of ascertainment or where the amount stipulated for is not so extravagant, or disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention or oppression. There is no sound reason why persons competent and free to contract may not agree upon this subject as fully as upon any other, or why their agreement, when fairly or understandingly entered into with a view to just compensation for the anticipated loss, should not be enforced.

249 U.S. at 365, 39 S.Ct. at 304. In this case the amounts stipulated to in the contract were not so extravagant as to imply fraud, mistake, circumvention, or oppression. To the contrary, officials endeavored to predict what costs the Air Force might actually incur if delay were to result and later made a downward modification in the assessment so as to only account for those costs. The conduct of the contracting officials, either before or after contract formation, does not suggest that the liquidated damages provision was intended for either an improper purpose or a purpose other than compensating the Air Force for the costs it incurred as a result of the delays.

Plaintiff cites *Coliseum Construction, Inc.,* ASBCA No. 36642, 89–1 BCA (CCH) ¶ 21,428, 1988 WL 142359 (1988), in arguing that the Air Force should not be permitted to "salvage the provision by modification and then by unilaterally re-interpreting and misapplying the faultily drafted liquidated damage provision." Plf's Br. filed May 15, 1990, at 16. In *Coliseum* the contracting officer, finding the amount assessed per day to be unreasonable, made a downward modification to the assessment in her final decision against the contractor. The contracting officer therein reduced the assessment from $1,820.11 per day to $220.11 per day—the latter figure representing the government's "calculated administrative cost." 89–1 B.C.A. (CCH) ¶ 21,428, at 107,-999. Citing the contracting officer's statement that the original figure was unreasonably inflated, the Armed Services Board of Contract Appeals held that this was a binding admission and set aside the liquidated damages assessment as a penalty:

> Since the reasonableness of the amount of liquidated damages is to be determined at the time the contract is entered into, the contracting officer's finding is equivalent to an admission that the stipulated amount was a penalty and, as such, is unenforceable. Respondent argues that the liquidated damages were fair and reasonable as of the final assessment, however, that is not the time when reasonableness is to be determined and, in any event, there is no authority to substitute the contracting officer's unilateral finding for the required stipula-

tion of both parties at the inception of the contract.

*Id.* at 108,001 (citation omitted).

None of the critical facts in *Coliseum* appears in this case. From the outset the parties intended to limit the Air Force's recovery of liquidated damages to its administrative costs and the BAQ differential of housing military personnel off-base. When an assessment over and above its costs was threatened, the Air Force authored a bilateral modification scaling back the amount of its damages. There are no facts in the record to suggest that the Air Force had an improper purpose in mind when it drafted the provision or applied the clause in manner that was unfair to plaintiff. Moreover, in *Coliseum* the contracting officer's reformulation of the assessment was accomplished by way of the contracting officer's "unilateral finding." Here, both parties reached agreement as to the amount and method of the downward modification by executing a bilateral modification. Lastly, the contracting officer in *Coliseum* made a wholesale reduction in the rate that was charged the contractor. In the case at bar the rate charged the contractor remained the same after modifications P00010 and P00032, as before. The rate, as originally agreed to by the parties, was still a reasonable estimate of delay damages. The change occurred in the basis upon which the rate was applied to the delayed units in plaintiff's possession. Setting aside the assessment of liquidated damages as a penalty would be inappropriate upon these facts.

Nor is there a reasonable basis in the record for plaintiff to assert that it was coerced into endorsing Modification P00010. There are neither affidavits nor exhibits which point up plaintiff's complaint with the proposed reduction; indeed, no objection appears anywhere in the record until the instant litigation. Plaintiff has failed to put forward sufficient facts of duress or government overreaching to create a disputed issue and preclude summary judgment for defendant.

██ Finally, plaintiff's claim that assessment of liquidated damages before the end of the 450-day performance period was erroneous is entirely without merit. The "Progress Schedule" included in the IFB clearly details the number, rate, order and time period for renovations. Mr. Troise, Jr. acknowledges the import of the schedule in his declaration, when he states:

EJT was authorized ninety (90) days to complete Block 1 of the renovation and an additional ninety (90) days to complete Block 2. The completion of each subsequent block, 3 through 10, was reduced to sixty (60) days per block.

Troise Aff. at ¶ 5. Mr. Troise, Jr.'s statements recognize, as did the parties, the limited time periods for renovations within the 450-day period.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted in part and denied in part consistent with this opinion, and plaintiff's cross-motion for partial summary judgment is denied. Accordingly,

IT IS ORDERED, as follows:

Paragraphs 26–29, 30(a), (d), and (e), Count II of plaintiff's amended complaint, and plaintiff's claim in respect of installation of HVAC equipment are dismissed. A scheduling order has been entered separately.